749 So.2d 1112 (1999)
James K. DUNAWAY, Appellant,
v.
Nonniel DUNAWAY, Appellee.
No. 97-CA-01461-COA.
Court of Appeals of Mississippi.
July 27, 1999.
*1114 Kim T. Chaze, Hattiesburg, Attorney for Appellant.
Eugene Love Fair, Jr., Hattiesburg, Attorney for Appellee.
BEFORE McMILLIN, C.J., DIAZ, AND LEE, JJ.
McMILLIN, C.J., for the Court:
¶ 1. This is an appeal from a judgment of divorce entered in the Chancery Court of Marion County dissolving the marriage of James Dunaway and Nonniel Dunaway. Mr. Dunaway has appealed solely on a number of matters relating to the financial aspects of the chancellor's judgment. We conclude that certain matters raised in the appeal have merit but that other issues do not warrant relief; therefore, we affirm in part and reverse and render in part.

I.

Facts
¶ 2. Mr. and Mrs. Dunaway had been married approximately thirty-four years before Mr. Dunaway left the marital home in March 1995 to reside in an open admittedly adulterous relationship with another woman. Prior to the separation of the parties, they had worked diligently in the accumulation of assets consisting primarily of real property, equipment, and livestock used in a dairy farm operation. After the separation of the parties, Mr. Dunaway filed for divorce and obtained a court order entitling him to sole operation of the dairy operation pending final resolution of the divorce. That earlier proceeding was never litigated to conclusion. At approximately the same time as he left the home, Mr. Dunaway effectively ceased to service much of the large debt that was associated with the business. Mr. Dunaway ultimately filed a new action for divorce, which is the case now before this Court. The chancellor, in this proceeding, determined that Mr. Dunaway's failure to keep the farm's debts current was due in part to his utilization of money to further his relationship with his new romantic partner. Ultimately, shortly after Mrs. Dunaway filed her complaint for divorce in this proceeding, Mr. Dunaway filed for protection from his creditors under the Bankruptcy Act.
¶ 3. After a trial in which both parties presented evidence relating primarily to the financial affairs of the marriage, the chancellor awarded Mrs. Dunaway a divorce on the ground of Mr. Dunaway's uncondoned adultery. Thereafter, in a lengthy and well-thought-through opinion, the chancellor considered the assets available for equitable distribution, the factors relating to awards of lump sum and periodic alimony, and the competing urgings of the parties as to what would constitute an equitable winding-up of the marriage, and entered his decision. In that decision, the chancellor made the following awards:
A. He ordered the sale of a parcel of real property referred to as "the Canebrake House" in Marion County, which he determined to have a gross value of $290,000 subject to an outstanding debt of $146,000, for a net value of approximately $144,000. The chancellor directed that the net recovery from that sale be applied toward another debt owed to the Farmers Home Administration that was secured by a lien on other real property including a parcel of land referred to as the "House on the Hill." The House on the Hill property was awarded to Mrs. Dunaway, with the expectation that, upon payment to the *1115 Farmers Home Administration of the Canebrake House sale net proceeds, Mrs. Dunaway would be able to negotiate a partial release of the House on the Hill acreage from the agency's deed of trust, leaving the lien for the balance of the Farmers Home Debt in place on the remaining collateral. The chancellor placed a value of $635,000 on the House on the Hill real estate and fixtures. Mr. Dunaway was ordered to be solely responsible for the remaining indebtedness due to Farmers Home after application of the Canebrake House sales proceeds, since he was awarded the remaining collateral for that loan (see next item).
B. The chancellor awarded Mr. Dunaway the remaining land in Marion County, which comprised the land and fixtures actually used in the dairy operation to Mr. Dunaway. The chancellor determined the gross value of this property to be $554,000. A portion of the land, in addition to the Farmers Home debt, was further encumbered by a bank loan having a balance of $45,000. Mr. Dunaway was ordered to assume responsibility for the Farmers Home loan balance after application of the Canebrake House proceeds and for the bank loan.
C. Mr. Dunaway received all of the farm equipment and livestock, a lot in California, $14,000 in Mississippi Chemical stock, $14,000 in debts due from individuals, and various other items of personality. According to the chancellor's itemization of the value of the total assets set apart to Mr. Dunaway, the total gross value was approximately $1,084,000. (An itemization of these assets contained in Exhibit C to the chancellor's opinion unfortunately contains a "TOTAL VALUE" figure of $1,782,798. That figure is obviously incorrect. When the itemized values are totaled, they actually come to $1,083,498. We will comment on the effect of this mathematical error later in this opinion.)
D. The chancellor also awarded to Mrs. Dunaway a small amount of Disney stock, a residential trailer with contents having a total value of $14,000, and certain other personality. According to the chancellor's valuations, the total award to Mrs. Dunaway by way of equitable distribution, including the previously-discussed real property, was $681,000.
E. Additionally, the chancellor awarded Mrs. Dunaway a money judgment against Mr. Dunaway in the amount of $115,552.91. This figure was based on (a) the chancellor's determination that Mr. Dunaway had dissipated approximately $81,000 in marital assets for the benefit of his new romantic partner, (b) approximately $7,500 in attorney's fees due Mrs. Dunaway in a previous uncompleted divorce action, (c) approximately $16,200 in past due loan payments and a $10,000 repair bill due on the Canebrake property which Mr. Dunaway had been ordered to pay in the previous proceeding.
F. Mr. Dunaway was ordered to pay Mrs. Dunaway the sum of $1,800 per month in periodic alimony, the obligation beginning on September 1, 1997.
G. Mr. Dunaway was ordered to pay $10,000 to Mrs. Dunaway to help her defray her attorney's fees.
¶ 4. Mr. Dunaway, dissatisfied with his treatment at the hands of the chancellor, perfected this appeal in which he advances five areas in which he believes the chancellor erred in these various financial awards. We will consider them in the same order in which Mr. Dunaway presents them in his brief.

II.

Two Preliminary Considerations
¶ 5. First, we must observe that Mr. Dunaway's claims of error involve matters in which the chancellor enjoys substantial discretion. Turpin v. Turpin, 699 So.2d 560(¶ 14) (Miss.1997). Our duty to interfere arises only if we are satisfied *1116 that the chancellor has manifestly abused the wide latitude of discretion afforded him in such matters. Id.
¶ 6. Secondly, we must observe from facts appearing in the record that the divorce judgment was entered on September 5, 1997, and Mrs. Dunaway died on July 27, 1998. This appeal has been revived in the name of Mrs. Dunaway's children as her successors in interest.

III.

Issue One: A Claim that the "Equitable" Division of Property was Not Equitable in Fact
¶ 7. Mr. Dunaway's first issue is a global attack on the chancellor's division of the marital assets. Mr. Dunaway does not take issue with the chancellor's apparent intention to attempt to make a roughly equal division of assets accumulated during the parties' lengthy marriage. Rather, his contentions seem to be (a) that, factually, the division was not equal because Mrs. Dunaway received more than one-half the value of the assets and she further escaped responsibility for any of the rather large indebtedness accumulated during the marriage; and (b) that, when the financial aspects of the judgment are considered in their totality, including the judgment of over $100,000 and the requirement of periodic alimony of $1,800 per month, even a roughly equal division of marital assets is inequitable.

A.

The Mathematics of the Division
¶ 8. Mr. Dunaway complains vigorously about being saddled with the bulk of the accumulated debt. He suggests that he has been left with no means of producing the income to service that debt because of the limited profitability of the dairy operation and his inability to borrow working capital since the real property he intended to use as collateral was awarded to Mrs. Dunaway. He argues that the chancellor's decision to leave him with the debt was nothing more than a punitive measure to punish him for his adulterous activities an impermissible consideration according to his argument. He also mounts an attack on the validity of the chancellor's determinations of value of the various components of the parties' assets, including allegations that the chancellor used outdated appraisals and arbitrarily rejected Mr. Dunaway's evidence concerning the true value of the cattle used in the dairy operation. Mr. Dunaway holds up the already mentioned addition error in an attempt to demonstrate the arbitrary nature of the chancellor's division. Finally, he urges that the chancellor's determination of gross value of marital assets is suspect because of the chancellor's refusal to value the dairy operation as an on-going business a valuation Mr. Dunaway believes would substantially reduce the actual worth of those assets set apart to him.
¶ 9. We reject these arguments. The only income-producing asset the couple owned at the time of their separation was the dairy farming operation, which was awarded to Mr. Dunaway in its entirety. All, or substantially all, of the accumulated indebtedness was associated with the development of that business. None of the assets awarded to Mrs. Dunaway were directly used in the dairy operation (except for Mr. Dunaway's claim that he needed all of the valuable assets in order to provide collateral for future loans to maintain the dairy operation). These considerations seem to point toward the inherent reasonableness of the chancellor's decision regarding responsibility for the debts so long as the net value of the two shares, after deduction of debt load, meets the chancellor's stated purpose of a roughly equal division.
¶ 10. We will deal with Mr. Dunaway's complaints with the chancellor's addition skills by simply disregarding the computation error and substituting the correct sum for purposes of our analysis. Thus, disregarding the addition error appearing in *1117 Exhibit C to the chancellor's opinion, it appears that Mr. Dunaway was awarded assets having a gross value of approximately $1,083,500. The parties' total indebtedness at separation was approximately $647,900. However, it was anticipated that the sale of the Canebrake House would produce about $290,000 to pay on the various debts, thereby reducing the total indebtedness to about $358,000. Subtracting that figure from Mr. Dunaway's apparent gross award of $1,083,500 shows that the net equitable distribution to Mr. Dunaway was in the range of $725,500. This amount is actually more than the $681,000 set apart to Mrs. Dunaway. In view of this fact and in view of Mr. Dunaway's insistence that he have sole control of the dairy farming operation we do not find it particularly inequitable that Mr. Dunaway was charged with discharging the remaining family indebtedness.
¶ 11. The factors to be considered in a division of marital assets are set out in some detail in Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994). Though Mr. Dunaway correctly cites this Court to the case, he does not suggest what particular factor in Ferguson the chancellor overlooked or misconstrued. Despite Mr. Dunaway's assertion that fault is not a legitimate issue in making equitable distribution, we observe that one of the factors to be considered is the "[c]ontribution to the stability and harmony of the marital... relationship...." Id. In light of the chancellor's clear conclusion that Mr. Dunaway significantly contributed to the breakup of this marriage by his extramarital affair, when considered in combination with the compelling evidence of Mrs. Dunaway's substantial efforts to assist in the accumulation of marital assets, we can find no error based on analysis of the net value of the two shares set apart to the litigants. McGee v. McGee, 726 So.2d 1220(¶ 13) (Miss.Ct.App.1998). We specifically reject any suggestion that the two shares are so disparate, based on debt allocation, as to evidence an intention on the part of the chancellor to unfairly punish Mr. Dunaway for his conduct.
¶ 12. Mr. Dunaway cites the Court to the case of MacDonald v. MacDonald, 698 So.2d 1079 (Miss.1997) to support his argument that the chancellor was not armed with enough information to make a fair distribution of marital assets because of the absence of proof as to the value of the dairy operation as an on-going business. We find MacDonald unhelpful. In that case, the chancellor valued a pawn shop business at $87,000. MacDonald, 698 So.2d at 1084(¶ 20). He left ownership of the business with the husband, but ordered him to pay his former wife $12,000 per year for ten years in satisfaction of whatever equitable interest she might have had in the business. Id. at 1082(¶ 11). The Mississippi Supreme Court affirmed the decision, but based its reasoning on an analysis of recent net profits of the pawn operation and appeared to completely disregard the $87,000 valuation of the business itself. Id. at 1086(¶ 37). Therefore, we do not believe the MacDonald decision can be read to stand for the principles of asset valuation advanced by Mr. Dunaway
¶ 13. Disregarding MacDonald and turning simply to the merits of Mr. Dunaway's argument, we find ourselves unpersuaded. The chancellor did not decline to consider the value of the dairy operation in making his division as Mr. Dunaway seems to indicate. Rather, he valued the various physical assets making up the farming operation, assigning a market value to each component. While it may be true that, based on poor performance of the operation in the recent past, Mr. Dunaway could demonstrate that the on-going value of the operation based on income analysis or some other accepted method of valuing closely-held businesses was not particularly high, the fact remains that this would not affect the break-up value of the various assets used in the operation. An individual operating an unprofitable business in a half-million dollar building cannot use the balance sheet of his poorly-conceived business *1118 venture to demonstrate that the building is without value. Likewise, if Mr. Dunaway concludes that he cannot deploy the assets set apart to him in the divorce to produce sufficient income to service the debt secured by those assets, he has the option to liquidate those assets, retire the debt, and utilize the net proceeds in a more profitable endeavor. To permit him to utilize the lower of (a) aggregate asset value or (b) a valuation based on principles for valuing an on-going business to assess the value of his share of the marital assets is, on its face, not founded on principles of equity.
¶ 14. We must also deal with Mr. Dunaway's complaints concerning the chancellor's allegedly unsubstantiated value determinations. We begin by acknowledging the directive of the Mississippi Supreme Court that the foundational step to make an equitable distribution of marital assets is to determine the value of those assets based on competent proof. Ferguson, 639 So.2d at 929. Nevertheless, it is incumbent upon the parties, and not the chancellor, to prepare evidence touching on matters pertinent to the issues to be tried. To the extent that Mrs. Dunaway's proof of value is subject to criticism, our review of Mr. Dunaway's competing proof suggests that it was equally unsatisfying. Nevertheless, we cannot help but note that substantially all of the conclusions reached by the chancellor as to values of assets were based upon evidence presented by Mr. Dunaway or derived from documentary evidence sponsored by him in the past in connection with such matters as loan applications. Mr. Dunaway argues, for instance, that the chancellor substantially undervalued the cattle, yet the figure adopted by the chancellor was one based on information in previous financial statements issued by Mr. Dunaway himself and the chancellor explained that he was rejecting Mr. Dunaway's evidence at trial on the basis that the lower values testified to in court represented the general worth of cattle of all nature as opposed to the higher value that attaches to producing milk cows. We have already discussed the somewhat related issue of Mr. Dunaway's complaints that the chancellor declined to lower his estimate of the value of the assets used in the dairy operation based on the fact that the business was not, at the time, particularly profitable. We need not discuss that proposition further here. We conclude that the chancellor did the best he could to work with the evidence of value presented at trial and decline to find error in his conclusions.

B.

The Inequitable Nature of the Entire Award to Mrs. Dunaway
¶ 15. The Mississippi Supreme Court has observed that, in the final analysis, one particular aspect of an award cannot be finally determined to be fair or unfair until it is viewed in the context of the entire award. Id. Mr. Dunaway argues that, when viewed in its totality, an award that includes $681,000 in unencumbered assets, a judgment of $115,552.91, and a periodic alimony award of $1,800 per month is, in the aggregate, so oppressive to Mr. Dunaway and his future ability to provide for himself as to constitute an abuse of the chancellor's discretion.
¶ 16. It is true that the chancellor was required to consider the need of Mr. Dunaway to continue to lead a reasonably comfortable post-divorce life in fashioning relief for Mrs. Dunaway. Gray v. Gray, 562 So.2d 79, 83 (Miss.1990). We also note that two of the important considerations in the award of periodic alimony are the earning capacity of the husband and his necessary living expenses. Crowe v. Crowe, 641 So.2d 1100, 1102 (Miss.1994). In this case, we find little in the chancellor's findings touching on Mr. Dunaway's ability to simultaneously (a) maintain a reasonably comfortable lifestyle for himself, (b) pay the relatively large periodic alimony sum of $1,800 per month, and (c) *1119 somehow satisfy a judgment in excess of $100,000.
¶ 17. But for the untimely death of Mrs. Dunaway, there would seem to be considerable force behind the argument that the total award was excessive in light of the evidence in this record. However, Mrs. Dunaway's death ended any periodic alimony obligation after only nine installments of alimony would have fallen due. Though $16,200 is, in itself, not an insignificant sum, this Court concludes, based on the unique facts of this case, that the best means of dealing with the issue is to simply reverse and render as to any installments of periodic alimony that accrued prior to Mrs. Dunaway's death but which remain presently unpaid.
¶ 18. The result of that determination nevertheless leaves us with the question of whether Mrs. Dunaway's combined award of equitable distribution and the judgment were, of themselves, excessive. We conclude that they were not, subject however, to a reduction in the judgment amount to be discussed subsequently. Again, we observe that the chancellor's equitable division of assets set apart to Mrs. Dunaway less than one-half the marital assets accumulated over long years of marriage and in no small part by virtue of her persistent efforts. The items making up the judgment itself, which we treat as being in the nature of a lump sum alimony award, were based upon two basic considerations: (a) legal obligations of Mr. Dunaway that already existed and (b) a finding that he had dissipated other marital assets in which Mrs. Dunaway had an equitable interest to pursue his extra-marital romantic relationship.
¶ 19. While these considerations certainly warrant some consideration on Mrs. Dunaway's behalf, we are nevertheless left with the conclusion that, to the extent the chancellor awarded to Mrs. Dunaway one hundred percent of those marital assets improperly dissipated by Mr. Dunaway, the award took on something of a punitive aspect. This is especially true in view of the chancellor's apparent overall intention to make a roughly equal division of marital assets. Recognizing that this roughly equal division was the chancellor's goal, we observe that, had Mr. Dunaway not dissipated those assets in the manner that he did, they would have been in that body of assets to be equally divided, thereby entitling Mr. Dunaway to approximately one-half of them. Though Mr. Dunaway's conduct in disposing of these assets certainly warranted some relief, we conclude that returning to Mrs. Dunaway the one-half that was rightfully hers is adequate relief. Therefore, as to the first five items listed in Exhibit A to the chancellor's judgment, totaling $81,881.36, we determine that a more equitable resolution of those items would be to award Mrs. Dunaway one-half the amount or $40,940.68. It is a different matter as to the remaining items in Exhibit A totaling $33,671.55. They were all adjudicated to be items owed, for various reasons, by Mr. Dunaway to Mrs. Dunaway or to be expended for her benefit. Therefore, no reduction in those amounts would appear appropriate. When the judgment is reduced in accordance with the foregoing analysis, the resulting lower total is $74,612.23. Considering the equitable nature of the various obligations represented in that figure, it is our view that, even when considered with an additional equitable distribution to Mrs. Dunaway of $681,000, the total financial award to her was within the range of the chancellor's discretion. Therefore, we determine that the portion of the judgment giving Mrs. Dunaway a money judgment of $115,552.91 should be reversed and judgment rendered by this Court in the reduced amount of $74,612.23, representing an award in the nature of lump sum alimony.

IV.

Attorney's Fees
¶ 20. The chancellor awarded Mrs. Dunaway $10,000 in attorney's fees without any analysis as to the reasonableness *1120 of that award or as to Mrs. Dunaway's inability to defray the costs of her attorney from her own assets. That award cannot be sustained, and we reverse and render as to attorney's fees. Johnson v. Johnson, 650 So.2d 1281, 1288 (Miss.1994); McKee v. McKee, 418 So.2d 764, 767 (Miss.1982).

V.

The Effect of Mr. Dunaway's Pending Bankruptcy
¶ 21. On appeal, Mr. Dunaway raises a claim, apparently for the first time, that the chancellor could not possibly arrive at an equitable division of marital assets so long as Mr. Dunaway remained in bankruptcy since it was unknown and unknowable what assets might remain to him after the bankruptcy proceeding ended. He cites the case of Heigle v. Heigle, 654 So.2d 895 (Miss.1995) in support of his position.
¶ 22. In Heigle, the chancellor in a divorce proceeding had concluded that the wife would be entitled to some combination of an equitable division of marital assets and an award of lump sum alimony; however, the bulk of the assets of the couple consisted of partnership interests held by Mr. Heigle, and the partnerships were involved in an on-going bankruptcy proceeding. Id. at 898. Though the chancellor purported to retain jurisdiction of the matter to make an appropriate award at the conclusion of the bankruptcy proceedings, he stated in his judgment that it could be considered final for purposes of appeal. Id. at 896. On appeal, the supreme court criticized the chancellor's preliminary conclusion that an equitable division or lump sum alimony was appropriate, saying that it was impossible to so find when it was unknown what assets would remain to Mr. Heigle after the bankruptcy proceeding. Id. at 898.
¶ 23. While Heigle v. Heigle might have had some application had it been timely raised at the trial level, we think that Mr. Dunaway raises the issue too late in the proceeding. He never sought a continuance in this proceeding based on his pending bankruptcy. He did not seek a stay order from the bankruptcy court directing the chancellor not to proceed with the divorce. He never so much as questioned the propriety of the chancellor's authority to proceed until such time as he found himself dissatisfied with the chancellor's ruling.
¶ 24. In order to preserve an issue for appeal, it is necessary to raise the matter first with the trial court on the theory that this Court cannot normally put the trial court in error for a ruling that it was never offered the opportunity to make. Bender v. North Meridian Mobile Home Park, 636 So.2d 385, 389 (Miss. 1994). To the extent that the right to proceed was not a jurisdictional question, therefore, we consider it waived.
¶ 25. Nevertheless, all courts must be constantly aware of questions of their jurisdiction to proceed and must be prepared to decide a question pertaining to jurisdiction at any time, even if the court must raise the issue on its own motion. Waits v. Black Bayou Drainage Dist., 186 Miss. 270, 185 So. 577, 578 (1939). Upon the commencement of a bankruptcy proceeding, there is issued an automatic stay that enjoins any further proceedings in other courts affecting the bankrupt's assets. 11 U.S.C.A. § 362 (Law Co-op.1995). Whether an attempted continuation of another proceeding in violation of the bankruptcy automatic stay is a jurisdictional issue or merely renders any judgment obtained of no effect and subjects the violators to sanctions before the bankruptcy court is an interesting question, but one with which we need not deal in this instance.
¶ 26. While it is conceded that Mr. Dunaway was involved in a bankruptcy proceeding at the time this divorce was tried, we note that the chancellor was not simply ignoring that fact, as Mr. Dunaway seems to suggest. Rather, in his judgment, *1121 the chancellor specifically found that "the bankruptcy court [had] lifted its stay of proceedings to allow the domestic claims of James and Nonniel to be addressed by this Court." While there is no formal order from the bankruptcy court to that effect in the record, we conclude that the presumption of correctness that attaches to any pronouncement by a court is sufficient, in this instance, to overcome any undocumented claim by Mr. Dunaway that the chancellor was proceeding "prematurely" in violation of the precepts of Heigle v. Heigle, 654 So.2d at 898.

VI.

Errors in Asset Valuation
¶ 27. Mr. Dunaway claims that the chancellor's computations were in error because he failed to include the value of the Canebrake House in the assets awarded to Mrs. Dunaway. This is without merit. Mrs. Dunaway had only temporary possession of that property pending a sale to be completed within six months. The entire proceeds were then to be used to retire or pay down various debts accumulated during the marriage. It is patently incorrect to suggest, on those facts, that the value of the Canebrake House should have been added to the total of the assets given to Mrs. Dunaway.
¶ 28. Mr. Dunaway then proceeds with a nine-item litany of complaints concerning the chancellor's efforts to value various assets, including lack of evidentiary foundation, lack of formal appraisals, acceptance of grossly inflated opinion evidence, and a rehash of the addition error in Exhibit C to the judgment. We find no merit in these various claims. It is our conclusion that the chancellor, faced with proof from both parties that was something less than ideal, made valuation judgments that find some evidentiary support in the record. To the extent that the evidence on which the chancellor based his opinion was less informative than it could have been, we lay that at the feet of the litigants and not the chancellor. The chancellor appears to have fully explored the available proof and arrived at the best conclusions that he could, and we can discover no abuse of discretion in those efforts that would require us to reverse his valuation determinations.
¶ 29. Mr. Dunaway's final issue is a claim that there was insufficient evidence to support the various findings underlying the chancellor's decision to award the $115,552.91 judgment. Though the evidence on the various matters was disputed, we conclude that there was sufficient testimony in the record, if found to be credible by the chancellor, to support his findings as to the existence of those expenditures and obligations that made up the various components of the judgment (as the judgment is being modified by this Court for reasons discussed in Part III(B) above).
¶ 30. THE JUDGMENT OF THE CHANCERY COURT OF MARION COUNTY IS AFFIRMED EXCEPT THE MONEY JUDGMENT OF $115,552.91 IS REVERSED AND JUDGMENT IN THE AMOUNT OF $74,612.23 IS HEREBY RENDERED AGAINST THE APPELLANT IN LIEU THEREOF, AND THE AWARD TO THE APPELLEE OF $10,000 IN ATTORNEY'S FEES IS REVERSED AND RENDERED. THE COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
SOUTHWICK, P.J., BRIDGES, DIAZ, IRVING, AND LEE, JJ., CONCUR.
PAYNE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J. AND THOMAS, J.
MOORE, J., NOT PARTICIPATING.
PAYNE, J., CONCURRING IN PART, DISSENTING IN PART:
¶ 31. I join the majority in all but one area. I respectfully dissent to the majority's *1122 rule in this case to reverse the award of attorney's fees to the wife, thereby extracting from the funds to which her heirs are entitled $10,000 of attorney's fees required to defend herself because of the actions of her husband. All of this is true at a time when her errant husband had more than ample funds available to contribute to this proceeding in her behalf. The only income producing asset in this estate was granted to the husband. The record shows this was an extremely labor intensive and time consuming case; therefore, there is no question but that the attorney's fees awarded were reasonable. The only other question was whether or not the wife was able to pay them. Since she had her means of income taken from her, I would not find that the chancellor abused his discretion in awarding partial attorney's fees.
¶ 32. The majority in the case sub judice cites cases that state a detailed analysis concerning the wife's ability to pay must be included to justify an award of attorney's fees. However, in Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss.1994) the Court stated the wife need not liquidate her savings account to pay her attorney's fees. In the present case, this is exactly what Mrs. Dunaway would have been forced to dopay attorney fees from her personal savings account, substantially decreasing the value of her estate. Therefore I must dissent to that portion of the majority opinion. I would affirm as to attorney's fees, otherwise I agree with the majority.
KING, P.J., AND THOMAS, J., JOIN THIS SEPARATE WRITTEN OPINION.