CARLTON, J.,
 

 for the Court.
 

 ¶ 1. On January 14, 2008, the chancellor granted April and Robert (Bobby) Faer-bers’ divorce, after ten years of marriage, on the ground of Bobby’s uncondoned adultery. April appeals, alleging that the chancellor erred when he: (1) failed to correctly apply the
 
 Ferguson
 
 factors in determining the equitable distribution of the couple’s marital property; (2) considered the business, College Park Auto (CPA), as Bobby’s separate property; (3) failed to award April permanent alimony; (4) failed to award April attorney’s fees; and (5) reduced Bobby’s child support obligations. Upon review, we find that the chancellor erred in his application of the law and abused his discretion in the manner that he: (1) classified April’s and Bobby’s property, (2) structured April’s lump-sum alimony, and (3) determined Bobby’s adjusted gross income for purposes of
 
 *856
 
 child support. Therefore, we reverse and remand.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. April and Bobby were married on July 7, 1995. According to April, the couple separated on February 11, 2005, when she discovered Bobby had engaged in an affair. At the divorce trial on December 4-5, 2007, Bobby admitted that he had engaged in three adulterous relationships during the couple’s marriage. On January 14, 2008, the chancellor granted April and Bobby a divorce on the ground of Bobby’s uncondoned adultery.
 

 ¶ 3. April and Bobby have two children, Jenna and Landon. Bobby did not seek physical custody of either child. As a result, the chancellor granted April custody of both children and set a visitation schedule for Bobby. The focus in this case concerns the manner in which the chancellor classified the property at issue, structured April’s lump-sum alimony award, and determined Bobby’s adjusted gross income.
 

 I. The Chancellor’s Distribution of April’s and Bobby’s Property
 

 ¶ 4. The chancellor summarized the equitable division of the marital estate in that April would receive the following property: (1) equity in the former family home, $55,000; (2) furniture in the former marital home, $32,950; (3) 2002 Ford Expedition, $6,600; (4) 1992 GMC Z-71, $2,000; (5) April’s jewelry, $7,000; (6) Roth IRA, $425; and (7) Honda ATV proceeds, $3,500. The chancellor determined that April’s distribution of the marital estate totaled $107,475.
 

 ¶ 5. In turn, the chancellor awarded Bobby the following marital property: (1) equity in the former marital home, $55,000; (2) furniture in the former marital home, $3,600; (3) 1981 Ford Bronco, $1,500; (4) shotguns and rifles, $4,500; (5) tractor, $10,500; (6) lawnmower, $5,150; and (7) Roth IRA, $425. The chancellor determined that Bobby’s distribution of the marital estate totaled $80,675.
 

 ¶ 6. The chancellor classified and valuated the following items as Bobby’s separate property: (1) the family home; (2) CPA, $298,000; (3) furniture Bobby acquired after the couple’s separation, $19,200; (4) 2002 Volkswagen Jetta, $8,750; and (5) one-half interest in a 2006 Dodge pickup truck, $14,500. The chancellor valued Bobby’s total separate estate at $340,450. The chancellor found April owned no separate property.
 

 ¶ 7. In evaluating the chancellor’s classification of the property and the factors he considered, we now turn to the chancellor’s specific findings regarding CPA, alimony, attorney’s fees, and child support.
 

 A. The Business, CPA
 

 ¶ 8. The chancellor classified CPA as Bobby’s separate property. The chancellor found that CPA constituted Bobby’s separate property based on the following reasons: (1) on December 14, 1995, Bobby’s father gave Bobby, via inter vivos gift, CPA and the real property on which CPA operates; (2) April did not directly contribute to CPA; (3) April did not work at CPA on a regular basis; (4) April did not prove that any appreciation in CPA’s value during the marriage would have been divisible property; and (5) both April and Bobby considered CPA to be Bobby’s separate property before the marriage.
 

 ¶ 9. As to CPA’s valuation, the chancellor found that since the parties failed to present the business-evaluation expert’s report as evidence, he was left with the testimony of the witnesses to determine the value of the business. The chancellor
 
 *857
 
 stated that Bobby had agreed on paper that his equitable interest in the business was approximately $298,000, which Bobby arrived at by valuing of all the business assets at $412,000 less $114,000 in debt.
 

 ¶ 10. The chancellor found that April had estimated that Bobby’s equity in CPA amounted to $400,000, but the chancellor stated that April had failed to take into account the $114,000 in debt. The chancellor, finding no evidence to dispute Bobby’s valuation of CPA, accepted Bobby’s testimony that Bobby’s equitable interest in CPA amounted to $412,000 less the $114,000 outstanding debt from Bobby’s $183,377 loan for CPA — -for a total value of $298,000.
 

 B. Alimony
 

 ¶ 11. The chancellor ordered Bobby to pay April $55,000 in lump-sum alimony at a monthly rate of $1,000, until paid in full. However, the chancellor ordered that for every month April resided in the family home, Bobby would not be required to make his $1,000 monthly lump-sum alimony payment. Per the chancellor’s order, April’s lump-sum alimony, in the amount of $55,000, represented her share of the $111,000 of equity in the family home.
 

 ¶ 12. At trial, Bobby admitted that he fraudulently obtained a loan by having a girlfriend sign April’s name to a $183,377 loan for CPA by using the $225,000 family home as collateral. April had refused to sign such a loan.
 
 [1]
 
 Despite Bobby’s admission regarding the fraudulent nature of the loan, the chancellor calculated the equity in the family home by subtracting $114,000, which was the amount remaining on Bobby’s $183,377 loan, against the family home’s value of $225,000, to arrive at $111,000 in equity. Then, the chancellor divided this figure of $111,000 in half in determining that April’s and Bobby’s shares of the equity in the family home each amounted to $55,000.
 

 ¶ 13. However, as noted above, the chancellor determined that April’s $55,000 of equity in the family home constituted her lump-sum alimony; however, Bobby’s $55,000 of equity in the family home constituted his portion of the marital estate.
 

 C. Attorney’s Fees
 

 ¶ 14. The chancellor found that April’s monthly income of $2,579, along with her distribution of the marital estate, provided April “ample resources with which to pay her attorney.” The chancellor also noted that “Bobby has his own attorney to pay.” As a result, the chancellor denied April an award of attorney’s fees.
 

 II. Child Support
 

 ¶ 15. Bobby did not seek custody of his two children. Therefore, the chancellor ordered Bobby to pay child support. The chancellor ordered Bobby to pay child support in the amount of $376 per month, which amounted to twenty-five and three/ tenths percent of his reported self-employment adjusted gross income of $1,880 per month. The chancellor also ordered Bobby to pay half of his children’s medical expenses. The chancellor determined Bobby’s adjusted gross income for purposes of child support solely upon the basis of what Bobby reported as his self-employment income.
 

 STANDARD OF REVIEW
 

 ¶ 16. Generally, a chancellor’s findings in domestic cases will not be reversed unless they are manifestly wrong,
 
 *858
 
 clearly erroneous, or the proper legal standard was not applied.
 
 Smith v. Smith,
 
 994 So.2d 882, 885(¶ 7) (Miss.Ct.App.2008).
 

 DISCUSSION
 

 I.Distribution of April and Bobby’s Marital Property
 

 ¶ 17. Marital property consists of assets acquired or accumulated during the course of the marriage.
 
 Hemsley v. Hemsley,
 
 639 So.2d 909, 915 (Miss.1994). In contrast, separate property consists of property acquired before or outside of the marriage.
 
 MacDonald v. MacDonald,
 
 698 So.2d 1079, 1082-83 (Miss.1997) (citation omitted).
 

 ¶ 18. In
 
 Ferguson v. Ferguson,
 
 639 So.2d 921, 928 (Miss.1994), the supreme court provided a number of guidelines for chancellors to follow in equitably distributing property. The chancellor must: (1) classify the parties’ assets as marital or separate; (2) value those assets; and (3) equitably divide the marital assets pursuant to the
 
 Ferguson
 
 factors.
 
 Id.
 
 The
 
 Ferguson
 
 factors include the following:
 

 1. [A spouse’s] substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
 

 a. Direct or indirect economic contribution to the acquisition of the property;
 

 b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family, duties and duration of the marriage; and
 

 c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
 

 2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
 

 3. The market value and emotional value of assets subject to distribution.
 

 4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse[.]
 

 5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution!]]
 

 6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties[.]
 

 7. The needs of the parties for financial security with due regard to the combination of assets, income and earning eapac- %[.]
 

 8. Any other factor which in equity should be considered.
 

 Id.
 
 Below, we address several of the
 
 Ferguson
 
 factors pertinent to this appeal.
 

 A. Contribution and Accumulation of Marital Property
 

 ¶ 19. We find that the chancellor erred in his application of the law and abused his discretion in his consideration of the
 
 Ferguson
 
 factors wherein he: (1) classified, valuated, and distributed CPA; (2) classified and distributed the family home; and (3) determined the accumulation and dissipation of April and Bobby’s marital assets.
 

 1. Classification, Valuation, and Distribution of CPA
 

 ¶ 20. The chancellor classified the business, CPA, as Bobby’s separate prop
 
 *859
 
 erty because: (1) Bobby’s father gave CPA and the real property on which CPA operates to Bobby via an inter vivos gift; (2) April did not work regularly at CPA; (3) April failed to prove that any appreciation in CPA’s value during the marriage could be considered divisible; (4) April made no direct contribution to CPA; and (5) both April and Bobby considered CPA to be Bobby’s separate property before the marriage.
 

 ¶21. In
 
 Hankins,
 
 we dealt with the issue of the classification and equitable division of the husband’s business.
 
 Hankins v. Hankins,
 
 866 So.2d 508, 511-12 (¶¶ 11-20) (Miss.Ct.App.2004). In
 
 Han-kins,
 
 the wife argued on appeal that her husband’s chicken farm, although his separate property upon entering the marriage, constituted marital property at the time of the couple’s divorce because the capital purchases made in furtherance of the chicken farm “were acquired during the marriage.”
 
 Id.
 
 at 511(¶ 15).
 

 ¶ 22. However, we found the that chicken farm remained the husband’s separate property because the husband alone obtained loans for the chicken farm; the wife did not contribute financially to the chicken farm; and the wife did not work on the chicken farm.
 
 Id.
 
 at 512(¶ 19). As a result, we concluded that “[t]he farm and the value of the equipment remain[ed] [the husband’s] separate property and should not have been included as part of the marital estate.”
 
 Id.
 
 However, we continued our analysis as to the distribution of the chicken farm’s value in the following manner:
 

 As the supreme court has repeatedly discussed, the relationship between a wage-earning spouse and a homemaking spouse is symbiotic. We presume that the efforts of each make the contributions of the other possible. The contributions are to be considered equal.
 
 Hemsley,
 
 639 So.2d at 915. [The wife] is not entitled to a portion of the business itself or of the value of equipment but she is entitled to that which she helped to create. She is entitled to an equitable distribution of “the accumulated portion, or the increase in value” of the business during the course of the marriage.
 
 Craft [v. Craft],
 
 825 So.2d [605,] 609(¶ 14) [ (Miss.2002) ].... It is this increase in value which should have been included in the calculation of the marital estate.
 

 Id.
 
 at 512(¶ 20).
 

 ¶ 23. In the case at bar, we find that when the chancellor classified CPA as Bobby’s separate property, he failed to consider how Bobby’s present $183,377 loan for CPA — as well as past loans secured by the family home — impacted the value of April’s equity in the home.
 
 See id.
 
 All of Bobby’s loans, unlike the loans made solely by the husband in
 
 Hankins,
 
 placed liens on the family home.
 
 Id.
 
 Hence April’s equity in the home was utilized in support and furtherance of CPA.
 

 ¶ 24. Additionally, the chancellor failed to properly consider April’s contributions as a homemaker when he found that April possessed no marital stake in CPA.
 
 Id. Hemsley
 
 explains that the contributions of the spouses are considered equal.
 
 Hemsley,
 
 639 So.2d at 915. Thus, under
 
 Hemsley,
 
 April is entitled to an equitable distribution of any increase in the value of CPA during the marriage.
 
 Id.
 

 ¶ 25. The chancellor stated that neither party in this case provided a valuation of CPA. However, the record does contain several years of CPA’s tax records,
 
 [2]
 
 8.05
 
 *860
 
 financial statements,
 
 [3]
 
 and testimony of the parties. The chancellor in his opinion cited
 
 Dunaway v. Dunaway,
 
 749 So.2d 1112, 1121(¶ 28) (Miss.Ct.App.1999), for the proposition that where parties provide inadequate proof of an asset’s value, a chancellor’s valuation with some evidentiary support will be upheld. Therefore, in finding no evidence to dispute Bobby’s valuation of CPA, the chancellor accepted Bobby’s testimony that Bobby’s equitable interest amounted to $412,000 less the $114,000 outstanding debt from Bobby’s $183,377 loan for CPA — for a total value of $298,000. However, we find that in the case at bar, unlike in
 
 Dunaway,
 
 the chancellor failed to fully explore the available proof at trial in valuating the property at issue.
 
 Id.; see also Smith,
 
 994 So.2d at 886(¶ 11) (finding that the chancellor did not abuse her discretion in equitably distributing the value of improvements and labor expended during the marriage to husband’s separate property).
 

 ¶ 26. Hence, on remand, the chancellor should consider the contributions of both spouses, the effect of any loans made for the benefit of CPA, and the potential commingling of personal assets and expenses with CPA’s assets and expenses.
 
 [4]
 

 See Dunaway,
 
 749 So.2d at 1121(¶ 28);
 
 Smith,
 
 994 So.2d at 887(¶ 11);
 
 Hankins,
 
 866 So.2d at 512(20).
 

 2. Classification, Valuation, and Distribution of the Family Home
 

 ¶ 27. The chancellor determined that the family home belonged to Bobby as his separate property. The chancellor stated the following in his opinion:
 

 The former marital residence is the property of Bobby, but that [sic] April does have an equitable interest in it acquired through the use as the family home for more than [twelve] years. All
 
 *861
 
 of the debt on the property was paid with income from the business, and income from the business is marital property. Bobby used April’s valuable homestead rights to [fraudulently] acquire loans against the property, and she is entitled to compensation.
 

 ¶ 28. We find that the chancellor erroneously applied the law and abused his discretion in finding that the family home was Bobby’s separate property when he failed to properly consider: (1) the family’s use of the home, (2) April’s separate contributions to the home, and, (3) April’s contribution as a homemaker.
 
 See Hemsley,
 
 639 So.2d at 915 (finding homemaker’s contributions equal those of wage-earning spouse);
 
 Lockert v. Lockert,
 
 815 So.2d 1267, 1269 (¶¶ 7-8) (Miss.Ct.App.2002) (finding that the couple’s home converted from wife’s separate property to the couple’s marital property through the family’s use of the home and the husband’s substantial contributions). Moreover, according to the supreme court, the family-use doctrine will almost always convert a separately owned “marital” home to marital property.
 
 See Stewart v. Stewart,
 
 864 So.2d 934, 938-39(¶ 16) (Miss.2003).
 

 ¶ 29. April and Bobby built the family home in 1995. Bobby testified that he paid for the home. April and Bobby and their children lived in this home until April and Bobby separated in February 2005, thus, triggering the family-use doctrine.
 
 See Lockert,
 
 815 So.2d at 1269(¶¶ 7-8). April stated that she and Bobby finished the interior of the home themselves except for the plumbing and the electrical work. April also testified that she financially contributed to finishing the home’s interior by cashing in her retirement fund, selling her former residence and car. The chancellor found that she invested the proceeds from these sources into the home. In sum, April testified that she separately contributed to the home’s equity in three ways: homemaker contributions, sweat equity, and financial investment.
 
 See id.
 

 ¶ 30. The chancellor noted that neither party provided the court with an appraisal of the family home. April’s 8.05 financial statement showed a value of $286,000 with no debt, but she admitted that due to needed repairs the home was worth approximately $225,000. In contrast, Bobby’s 8.05 financial statement showed a value of $300,000, a mortgage of $130,160 that was paid by CPA at $3,000 a month and a resulting equity of $169,840. The court then concluded that the value of the former marital residence was $225,000, the mortgage debt was $114,000, and the equity was $111,000.
 
 [5]
 

 ¶ 31. On remand, consistent with the authority cited herein, the chancellor should consider the contributions of both spouses, the impact of the family-use doctrine, and any liens on the family home when he classifies, valuates, and distributes the family home.
 

 3. Accumulation and Dissipation of Marital Assets
 

 ¶ 32. Bobby left the family home in February 2005. On July 5, 2005, a previous chancellor entered a temporary support order. Under our governing case law, marital property continues to accumulate until the court enters a temporary support order.
 
 Stone v. Stone,
 
 824 So.2d 645, 648(¶7) (Miss.Ct.App.2002). Hence, April and Bobby’s marital property contin
 
 *862
 
 ued to accumulate until the July 5, 2005, temporary support order.
 
 See id.
 

 ¶ 33. This case presents some confusion in addressing the accumulation of marital property and dissipation of assets. Such confusion takes root from several sources in the record, including CPA’s tax records,
 
 [6]
 
 Bobby’s reported self-employment income, both parties’ testimony,
 
 [7]
 
 the conflicting 8.05 financial statements,
 
 [8]
 
 and the assertion of the commingling of CPA’s expenses with personal expenses.
 
 [9]
 

 ¶ 34. With respect to the dissipation of marital assets, we note that ordinary and reasonable living expenses used during separation generally do not constitute a dissipation of marital assets.
 
 See Childs v. Childs,
 
 806 So.2d 273, 275-76 (¶¶ 13-20) (Miss.Ct.App.2000);
 
 Pittman v. Pittman,
 
 791 So.2d 857, 865(¶ 22) (Miss.Ct.App.2001). We classify debts incurred for the benefit of the marriage as marital debt.
 
 See Prescott v. Prescott,
 
 736 So.2d 409, 418(¶ 48) (Miss.Ct.App.1999) (stating that chancellor properly ordered husband to pay wife’s credit card debt for items purchased for the marital home). Additionally, we consider debts incurred by a spouse before marriage or for individual purposes and not used for the general welfare of the marriage as separate debt.
 
 See, e.g., Garriga v. Garriga,
 
 770 So.2d 978, 984(¶ 27) (Miss.Ct.App.2000) (stating that funds used by the wife for extramarital relationship constituted dissipation and required reimbursement to the marital estate).
 

 ¶ 35. We note that April’s 8.05 financial statement asserts that Bobby possesses various personal assets, including a $35,000 motorcycle; a $52,000 boat; and a $8,500 Gator.
 
 [10]
 
 To determine if the above expenses constituted separate, marital, or business property, the chancellor must consider whether the assets were acquired with marital or separate funds and whether they were acquired after the demarcation in the marriage or outside of the marriage.
 
 See Childs,
 
 806 So.2d at 275 (¶¶ 11-20);
 
 Strong v. Strong,
 
 981 So.2d 1052, 1055(¶17) (Miss.Ct.App.2008);
 
 Garriga,
 
 770 So.2d at 984(¶ 27);
 
 Prescott,
 
 736 So.2d at 418(1148).
 

 B. Alimony
 

 ¶ 36. We find that the chancellor committed reversible error in the manner in which he structured April’s lump-sum alimony. A “chancellor may divide marital assets, real and personal, as
 
 *863
 
 well as award ... alimony, as equity demands.”
 
 Ferguson,
 
 639 So.2d at 929. “[T]he purpose of alimony is not punitive, but instead, is designed to assist the spouse in meeting his or her reasonable needs while transitioning into a new life.”
 
 Holley v. Holley,
 
 892 So.2d 183, 185(¶ 7) (Miss.2004) (citation omitted). Accordingly, the chancellor should consider alimony only after the equitable division of the marital property.
 
 Lauro v. Lauro,
 
 924 So.2d 584, 588(¶ 9) (Miss.Ct.App.2006) (stating that alimony recedes when equitable distribution expands).
 

 ¶ 37. Here, the chancellor determined that April’s share of equity in the family home amounted to $55,000. The chancellor then ordered Bobby to pay April her share of equity in the family home in the form of lump-sum alimony at a monthly rate of $1,000, until paid in full, while at the same time crediting Bobby this monthly amount for every month that April resided in the family home.
 
 [11]
 

 See Cheatham v. Cheatham,
 
 537 So.2d 435, 438 (Miss.1988) (providing factors for chancellors to consider when awarding lump-sum alimony). Lump-sum alimony is a final settlement that vests when awarded and is not subject to modification.
 
 Hubbard v. Hubbard,
 
 656 So.2d 124, 129 (Miss.1995). A chancellor may order one party to make third-party payments as part of some types of alimony, but not with lump-sum alimony.
 
 See id.
 

 ¶ 38. As stated above, April’s lump-sum alimony award of $55,000 represented her share of the equity in the family home. Additionally, the chancellor ordered that for each month April resided in the marital home, Bobby would not be required to pay April her share of her lump-sum alimony for that month. However, as we noted above, lump-sum alimony vests when ordered and cannot be modified.
 
 Id.
 
 Therefore, the chancellor abused his discretion and committed reversible error when he awarded April lump-sum alimony in this manner.
 
 See Miller v. Miller,
 
 874 So.2d 469, 474-75 (¶¶ 14-16) (Miss.Ct.App.2004).
 

 ¶ 39. Moreover; when we reverse a court’s division of marital property, we must also reverse any accompanying award or denial of alimony.
 
 Lauro,
 
 924 So.2d at 588(¶ 9). On remand, if the chancellor determines that either April or Bobby suffers a deficit after he equitably divides April’s and Bobby’s property pursuant to the controlling precedent, he should then consider the issue of alimony pursuant to the Armstrong
 
 [12]
 
 factors.
 
 See Ferguson,
 
 639 So.2d at 928-29.
 

 C. Any Other Factors
 

 ¶ 40. The chancellor denied April an award of attorney’s fees. The chancellor possesses the discretion to award attorney’s fees.
 
 Spahn v. Spahn,
 
 959 So.2d 8, 15(¶ 18) (Miss.Ct.App.2006). Upon remand, the chancellor should consider each party’s financial ability when deciding whether to award attorney’s fees.
 
 Id.
 
 The chancellor can consider assets received as part of an equitable distribution when determining a party’s ability to pay attorney’s fees.
 
 See Hankins v. Hankins,
 
 729 So.2d 1283, 1286(¶ 13) (Miss.1999) (reversing and remanding for chancellor to consider the $210,000 award in equitable distribution in determining the party’s
 
 *864
 
 ability to pay attorney’s fees). Since we remand this case regarding equitable distribution, alimony, and child support, the chancellor should consequentially reconsider this issue as well.
 
 See Lauro,
 
 924 So.2d at 588(¶ 9).
 

 II. Child Support
 

 ¶ 41. Bobby did not seek custody of his two children. The chancellor ordered Bobby, as the non-custodial parent, to pay $376 a month in child support, which amounted to twenty-five and three/ tenths percent of Bobby’s reported self-employment income of $1,880. The chancellor also ordered Bobby to pay half of his children’s medical expenses. However, the record does not substantially support the chancellor’s child support award in light of Mississippi Code Annotated section 43-19-101(3)(a)-(b) (Rev.2004).
 

 ¶ 42. Section 43 — 19—101 (3)(a) — (b) provides the parameters for determining a party’s adjusted gross income for child support purposes in the following manner:
 

 (a)
 
 Determine gross income from all potential sources that may reasonably be expected to be available to the absent parent including, but not limited to,
 
 the following: wages and salary income;
 
 income from self[-]employment;
 
 income from commissions; income from investments ...; interest income and income on any trust account or property; absent parent’s portion of any joint income of both parents; ... annuity and retirement benefits ...; any other payments made by any person, private entity, federal or state government or any unit of local government; alimony; any income earned from an interest in or from inherited property;
 
 any other form of earned income ...
 

 (b) Subtract the following legally mandated deductions:
 

 (i) Federal, state and local taxes. Contributions to the payment of taxes over and beyond the actual liability for the taxable year shall not be considered a mandatory deduction;
 

 (ii) Social security contributions;
 

 (iii) Retirement and disability contributions except any voluntary retirement and disability contributions^]
 

 (Emphasis added).
 

 ¶ 43. Here, the chancellor accepted Bobby’s asserted monthly self-employment income
 
 [13]
 
 reflected on his tax documents as $1,880 without considering the potential commingling of CPA’s assets and expenses with personal assets and expenses,
 
 [14]
 
 all of Bobby’s income sources, and without considering the generally recognized test for determining self-employment income. Generally, self-employment income amounts to gross income
 
 less ordinary and reasonable expenses
 
 incurred in
 
 *865
 
 producing the income.
 
 See,
 
 e.g.,
 
 Henderson v. Henderson,
 
 952 So.2d 273, 279(¶ 18) (Miss.Ct.App.2006) (stating that chancellor properly deducted medical malpractice premiums from a physician’s income to arrive at adjusted gross income).
 

 ¶ 44. On remand, the chancellor should consider the potential commingling of business and personal expenses, all of Bobby’s income sources, and the manner in which Bobby determined his self-employment income when calculating Bobby’s adjusted gross income for child support purposes. Miss.Code Ann. § 43-19-101(3)(b);
 
 Henderson,
 
 952 So.2d at 279(¶ 18).
 

 III. Other Considerations on Remand
 

 ¶ 45. During the proceedings below, April filed a motion to recuse the chancellor due to alleged bias in favor of Bobby in this case. On appeal, April fails to designate this issue as a separate assignment of error, but she does argue that the chancellor’s findings display bias. The chancellor denied April’s motion. Upon review, we find that April failed to provide this Court with sufficient proof that the chancellor abused his discretion when he failed to recuse himself from this ease. However, since this Court remands this case for reconsideration by the chancellor, the issue of recusal may be also revisited on remand.
 

 ¶ 46. A judge’s decision regarding recusal is reviewed under an abuse of discretion standard.
 
 Miss. United Methodist Conference v. Brown,
 
 929 So.2d 907, 908(114) (Miss.2006). Canon 3E(1) of the Mississippi Code of Judicial Conduct states that judges “should disqualify themselves in proceedings in which their impartiality might be questioned by a reasonable person knowing all the circumstances ...” This Court presumes that a judge, sworn to administer impartial justice, is qualified and unbiased.
 
 Hathcock v. S. Farm Bureau Cas. Ins. Co.,
 
 912 So.2d 844, 848(¶ 9) (Miss.2005) (citation omitted). This presumption is overcome only by showing beyond a reasonable doubt that the judge was biased or unqualified.
 
 Id.
 
 (citation omitted).
 

 ¶ 47. April argues in her brief that the chancellor exercised bias toward Bobby as shown in the chancellor’s findings and ultimate judgment in the case. April argues that the chancellor showed bias as a result of the following circumstances: (1) Bobby’s attorney, Robert Jones, supported the chancellor’s election campaign; (2) Bobby supported the chancellor’s campaign as evidenced by an invitation to a post-election appreciation gathering sponsored by Bub-ba Hampton that was mailed from Jones’s law firm as indicated by the invitation’s return address; (3) statements and activities allegedly attributable to Bobby; and (4) Hampton’s service as co-chair of the chancellor’s election campaign.
 

 ¶ 48. When April discovered the invitation to the post-election appreciation gathering for the chancellor addressed to Bobby, she filed a motion for judicial recusal, which the chancellor denied. As stated, April failed to designate the chancellor’s bias as a separate assignment of error on appeal. However, this Court could review the recusal issue in this case under the plain-error doctrine if April had presented sufficient evidence to warrant such review. “The plain-error doctrine has been construed to include anything that ‘seriously affects the fairness, integrity or public reputation of judicial proceedings.’ ”
 
 Pickle v. State,
 
 942 So.2d 243, 246(¶ 13) (Miss.Ct.App.2006) (quoting
 
 United States v. Olano,
 
 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).
 

 ¶ 49. However, April has failed to show any evidence beyond a reasonable doubt
 
 *866
 
 that the chancellor in this case was biased or unqualified thereby requiring his recu-sal in this case.
 
 See Hathcock,
 
 912 So.2d at 848(¶ 9);
 
 see also
 
 Code of Judicial Conduct 3E(2) (“A party may file a motion to recuse a judge based on the fact that an opposing party or counsel of record for that party is a major donor to the election campaign of such judge.”).
 

 ¶ 50. We find the chancellor’s opinion, and not evidence presented by April, actually sheds the most light on this issue. In response to April’s motion for recusal, the chancellor stated the following in his order:
 

 This judge takes notice that the law firm of counsel for [Bobby] was actively involved in this judge’s campaign, but that involvement was primarily on the part of [Jones’s] partner,
 
 [15]
 
 since [Jones] as a [m]unicipal [j]udge, was restricted in political activity. This judge also takes notice that [Jacob], attorney for [April], expressed his support for this judge’s candidacy during the campaign.
 

 From the above facts, the chancellor concluded that “there [was not a] reasonable basis to form a conclusion that there [was] a question of the court’s impartiality in this case.”
 

 ¶ 51. From the record before us, we find that April has failed to present sufficient evidence that the chancellor was biased beyond a reasonable doubt in this case.
 
 See id.; Brown,
 
 929 So.2d at 908(¶ 4). Nonetheless, since we reverse and remand this case on other grounds, this issue may be revisited on remand.
 

 ¶ 52. THE JUDGMENT OF THE LAUDERDALE COUNTY CHANCERY COURT IS REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
 

 KING, C.J., LEE, P.J., BARNES, ISHEE, ROBERTS AND MAXWELL, JJ„ CONCUR. IRVING, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. MYERS, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS, J., NOT PARTICIPATING.
 

 [1]
 

 . The record reflects that in 1996, April signed a deed of trust on the family home so that Bobby could borrow money for CPA, but she refused to sign any more loans after that date.
 

 [2]
 

 . CPA's tax records for 2006 reflect the following expenses and net profit: car and truck expenses, $30,046; mortgage paid to bank, $15,080; unspecified contributions, $2,860;
 
 *860
 
 and a
 
 net profit of $3,781.
 
 In 2004, CPA’s tax records indicate the following: car and truck expenses, $9,999; mortgage paid to bank, $9,042; unspecified contributions, $1,405; "miscellaneous expenses,” $1,114; and a
 
 net profit of $18,494.
 
 In 2003, CPA tax records reflect the following: car and truck expenses, $9,317; mortgage paid to bank, $10,725; unspecified contributions, $4,000; "miscellaneous expenses,” $14,047; and a
 
 net loss of $530.
 
 In 2002, CPA’s tax records include the following: bus purchased, $84,410; truck purchased, $13,444; car and truck expenses, $8,344; mortgage paid to bank, $4,938; and a
 
 net profit of $14,025.
 
 The record contains no determination as to whether the assets and expenses that Bobby claimed belonged to CPA actually constituted personal expenses, and if so, there is no consideration of the impact of such on the valuation of the business and marital property.
 

 [3]
 

 . April disputes the credibility of CPA's assets and expenses as evidenced by her 8.05 financial statement. For example, in April’s 8.05 financial statement, she includes the following regarding "other personal property”: (1) 1998 Eagle Motor Home, $175,000; (2) motorcycle, $35,000; (3) boat, $52,000; (4) backhoe, $75,000; (5) tractor, $13,000; (6) Gator, $8,500; (7) dump truck, $6,000; (8) bulldozer, $30,000; (9) rollback wheeler, $13,000; (10) travel trailer, $10,000; (11) lawnmower, $20,000; (12) vehicles used in CPA, $200,000; (13) household furniture, $6,000; (14) guns, $4,500; and (15) tools, $7,000.
 

 In comparison, Bobby’s
 
 unsigned
 
 8.05 financial statement shows none of the following personal expenses: (1) mortgage/rent, (2) oil and gas, and (3) car payments. However, Bobby claims all three of these items on CPA’s tax records. Bobby claims as "other personal property” on his 8.05 financial statement, the following assets: (1) furniture, $16,000; (2) patio furniture, $1,700; (3) television and stereo equipment, $1,500; (4) lawnmower and weed eater, $300; (5) backhoe, $12,000; (6) guns ("some non-marital”), $4,500; and (7) tractor ("non-marital”), $8,000. As shown, Bobby’s 8.05 financial statement conflicts with April’s 8.05 financial statement as to what constitutes personal versus business property.
 

 [4]
 

 .
 
 See supra
 
 notes 2-3.
 

 [6]
 

 .
 
 See supra
 
 note 2.
 

 [7]
 

 . Bobby testified that CPA bought a Caterpillar backhoe purchased before the separation valued at approximately $12,000. The record does not reflect the date of purchase, but Bobby testified that he also bought a Harley Davidson chopper motorcycle, but he sold it four months before the divorce hearing at a loss. The business also bought, on a trade, Bobby’s father's household furniture consisting of a couch and love seat. Bobby explained also in his testimony that the motor home, which is listed as a bus on CPA's tax returns, helps him on his taxes because the business assets are depreciated. So, CPA’s tax returns show no profit even though it has assets, and Bobby and his father take salary draws from CPA.
 

 [8]
 

 .
 
 See supra
 
 note 3.
 

 [9]
 

 . For example, Bobby testified at the divorce trial that he purchased two trucks for $56,000 on February 11, 2005, through CPA. He also testified that he purchased $30,000 in furniture by "decreasfing] a debt that Wrangler furniture owed CPA.” Additionally, the record contains testimony by Bobby that he used the motor home, identified on CPA's tax documents as a bus, to entertain potential customers and take them to the races and trips to entice them to use his garage instead of his competitors' garages.
 

 [10]
 

 .
 
 See supra
 
 note 3.
 

 [11]
 

 . We note that in determining the alimony award, the chancellor provided in his opinion that Bobby’s separate estate was substantial and that Bobby possessed assets that were not essential to his business which he could liquidate to pay April's lump-sum alimony. However, the chancellor’s findings did not set forth any resolution or evaluation of these non-essential assets.
 

 [12]
 

 .
 
 Armstrong v. Armstrong,
 
 618 So.2d 1278, 1280 (Miss.1993).
 

 [13]
 

 . Bobby’s testimony reveals that he generally does not show a profit or pay taxes for CPA, even though he makes a monthly draw from the business and has assets that CPA owns, because of the depreciation of assets. In his opinion, the chancellor notes April's assertion that Bobby understated his income and that during the marriage he provided her with $1,500 a month to run the household, as well as a gas card and a credit card, all paid by CPA. The chancellor concluded that Bobby's tax returns were commensurate with what he reported on his 8.05 financial statement. The chancellor stated that if April was indeed paying the household bills with the $1,500 per month provided by Bobby, then Bobby must have been turning over most of his paycheck to her for the mutual benefit of the household. He noted that Bobby reported expenses were $1,835 per month and that his expenses did not appear to be overstated. However, the chancellor failed to determine if the expenses attributed to CPA were indeed for the benefit of CPA or were personal in nature.
 

 [14]
 

 .
 
 See supra
 
 notes 2-3.
 

 [15]
 

 . The chancellor did not provide the name of Jones's law partner in his order denying April’s motion for recusal.