600 So.2d 193 (1992)
Beatrice R. CLEVELAND
v.
Lance E. CLEVELAND.
No. 90-CA-0995.
Supreme Court of Mississippi.
May 13, 1992.
Thomas Wright Teel, Clare S. Hornsby, Sekul Hornsby Teel & Tisdale, Biloxi, for appellant.
Patricia C. Champagne, Gulfport, for appellee.
Before HAWKINS, P.J., and PRATHER and ROBERTSON, JJ.
HAWKINS, Presiding Justice, for the Court:
Beatrice Cleveland was granted a divorce from Lance Cleveland in the Harrison County Chancery Court on the ground of habitual cruel and inhuman treatment. She has appealed the chancery court judgment of a cash award of $50,000 lump sum alimony and $600 a month periodic alimony for seven years. Lance has cross-appealed alleging that the lump sum alimony and the periodic alimony were excessive.
We reverse and remand as to the lump sum alimony, and reverse and increase the monthly periodic alimony to $1,000 with no set termination date.

*194 FACTS
Lance and Beatrice Cleveland married May 27, 1982. He was the sole owner of Coastal Chiropractic Clinic in Long Beach with one full-time and one part-time employee. Beatrice was working for the clinic when they married.
Beatrice lived in a house on Beatline Road in Long Beach, which became the administrative office for Coastal Chiropractics. When Lance moved in with Beatrice he had no furniture, but he did assume the house mortgage payments that Beatrice's former husband had been paying.
Lance was in poor financial shape in 1982. He had filed for Chapter 7 bankruptcy in 1981, affecting his ability to obtain financing. His 1979 station wagon had over 100,000 miles. By 1984, however, he was able to refinance the mortgage on the Beatline Road house and in the process changed title to the house to give him co-ownership with Beatrice.
Lance's father prepared a financial statement for Lance which listed property Lance owned in May, 1982, the larger items being:

 Asset Value Liability
Silver Run Lake _________________________ $ 12,000 ________________ $ 6,000
1981 Cessna airplane ____________________ $ 75,000 ________________ $51,000
1979 Chevrolet station wagon ____________ $ 12,000 ________________ $ 6,000
Chiropractic Equip. _____________________ $ 40,000 ________________ $20,000
 ________ _______
 TOTAL $139,000 $83,000

In determining his assets in 1982, Lance listed these items in the estimation of his net worth, but failed to depreciate them. Lance's statement of net worth indicated assets of $146,000 and liabilities of $83,000, creating a stated net worth of $63,000 at the time of marriage. Also, Lance did not include a $20,000 student loan which was only partially paid off when they married.
Lance's chiropractic practice began to flourish following their marriage. Lance incorporated his clinics as Coastal Chiropractic in 1986, and made Beatrice vice-president. She thought that she was half owner of the corporation prior to the separation, but no corporate shares were ever issued to her. After they separated he removed Beatrice as vice-president.
Before Beatrice married Lance, she was responsible for bulletins, mailouts, television advertising and some radio advertising for Coastal Chiropractic, and at Lance's request continued working in the same capacity after they married.
Beatrice had no high school diploma, GED or a college degree. Prior to working at Coastal Chiropractic, Beatrice was a housewife and held brief employment as a waitress, sales person and cashier. She had scoliosis of the spine, which caused dizziness, fainting spells, headaches and sometimes the temporary loss of the use of her right arm.
Lance's income tax records track the growth of his business and income:

 Gross Business Income Salary Adjusted Gross
 Income
 1984 ___ $139,675 ____ $59,059 __ ?
 1985 ___ $141,889 ____ $44,825 __ ?
 1986 ___ $244,824 ____ $62,257 __ $35,956
 1987 ___ $339,183 ____ $162,548 __ $145,212
 1988 ___ $885,944 ____ $108,860 __ $105,690

*195 In May, 1989, the Coastal Chiropractic Clinics  there were two at the time  billed out $115,396 and had receivables of $58,989. From June, 1988, to May, 1989, Coastal Chiropractic billing ranged from a high of $186,822 in November, 1988, to a low of $77,413 in June, 1988. The receivables varied from a low of $26,946 in June, 1988, to a high of $81,876 in December, 1988. In 1989, the average collections were $70,000, payroll was $40,000 a month and federal withholding was $10,000 a month. The loans and lease on the business equipment were $10,000 a month and rent was $5,000 a month.
Coastal Chiropractic had twenty-three employees with four doctors and locations in Long Beach, Biloxi and Waveland in April, 1990. Lance was considering expansion with two more clinics on the coast and then moving into the Jackson area.
In addition to his $108,860 salary, Lance's business provided him with a Mercedes, paid his car insurance, license tag, gas, maintenance and car phone expense. The business also paid for Lance and Beatrice's medical insurance plus medical expenses not covered by insurance, the premium for a $100,000 life insurance policy required by Hancock Bank to collateralize a loan and disability insurance.
The Beatline Road house, where the Clevelands lived until July, 1987, served as the administrative office for the business beginning in July, 1988. Coastal Chiropractic paid $1,200 a month rent, the phone bill and utilities for using the house as the administrative office. Lance lived there following their separation. The rent of $1,000 was paid into an annuity for Lance with Jackson National, while the other $200 was used to pay for the house's taxes, insurance and maintenance.
Lance's itemization of monthly living expenses on March 1, 1990, was $11,259. This statement, which was also prepared by his father, listed among other items, the mortgage payment  $1,450  for the home/administrative office on Beatline Road in Long Beach. The business paid $1,200 of this as rent. Beatrice disputed the listed Harbor View condominium mortgage payment of $1,657, and a monthly breakdown of payment signed by Lance indicated that the total payment was $1,052. Lance had a monthly promissory note payment of $275.60 and not $560 as listed on his expense statement. Furthermore, he listed $1,500 as an expense to be paid for a pension, but admitted that this payment was not made in March and one had not been made since the business was incorporated in 1986. Lance also listed as personal expenses telephone expenses, utilities, health care insurance, car insurance, car registration, which were all paid by the business.
According to Lance's personal financial statement as of May 17, 1989, before he and Beatrice separated, his total assets were $329,600 and his net worth was $227,800. He also produced a personal financial statement dated April 5, 1990, indicating his assets were $234,950 and his net worth was $10,850. In the April 5, 1990, statement Lance failed to list as an asset an investment of $27,700 in Coastal Chiropractic. He also gave the value of the Beatline Road home as $84,000 in the May 17, 1989, statement and $65,300 on April 5, 1990. Interest in a timeshare condominium in Florida, jointly owned by Lance and Beatrice, was listed at $14,000 in the 1989 statement and $12,250 in 1990. Lance further valued his personal belongings in 1989 at $28,000 and 1990 at $5,000.
Lance and Beatrice bought the Mockingbird Lane house they owned as joint tenants for $240,000 with a down payment of $24,000 borrowed from the bank. In April or May, 1989, the house was sold for $265,000 with selling costs of $17,425. Beatrice testified a $47,000 profit was made when the house was sold, which she never saw. Lance denied any profit was made in the house sale, but coincidentally his May 17, 1989, personal financial statement listed $47,000 in cash at Hancock Bank as an asset.
After selling the Mockingbird Lane house, Lance borrowed in his name $95,000 for the purchase of the Harbor View condominium *196 and placed $35,000 in an escrow account for improvements. According to Lance, the net purchasing price of the condominium was $122,121.21, which included the earnest money, down payment and buyer's cost of $27,121.21. Beatrice said that the condominium was sold to them for $85,000, but the note is in the amount of $95,000. Lance and Beatrice jointly owned the condominium.
Lance explained that the $35,000 in escrow was to be used expressly to furnish the condominium  buy draperies, carpet, furniture, beds, dressers, etc. The escrow money could only be withdrawn with Lance and Jerry Rosetti's approval. Rosetti was an attorney for the mortgage company holding Lance's note. The separation occurred shortly after the condominium was purchased, and Lance never used the escrow money to furnish the condominium.
Some time after the separation in the fall of 1989, Beatrice  knowing about the escrow  withdrew $25,000 from the account at Bank of Mississippi in addition to $8,500 or $9,000 from a joint checking account, one-half of the account. This was done without the approval of Lance or Rosetti. The Bank of Mississippi sued her and a judgment was entered against Beatrice for $25,000. This matter was resolved by the chancellor in the divorce decree.
As of April 4, 1990, Beatrice had only $3,000 of the $33,500-$34,000 left. The money had been expended for living expenses. Lance paid her nothing following their separation. Lance also took Beatrice's Cadillac automobile from her. Lance continued, however, to pay the mortgage and the utilities at the Harbor View condominium where Beatrice lived.
Beatrice had no source of income after the separation. Her monthly living expenses were estimated to be $3,100 a month. This included $1,200 in condominium costs and $300 for car maintenance.
Beatrice and Lance Cleveland separated on June 13, 1989. She initially filed for separate maintenance. Lance filed a counterclaim for a divorce on June 26, 1989. Beatrice amended her original complaint and filed a complaint for divorce on April 4, 1990.
In his decree the Chancellor awarded Beatrice $50,000 lump sum alimony, $600 monthly periodic alimony for seven years or until further order of the court, exclusive use and possession of the condominium at Harbor View Condominiums, medical insurance provided by Lance for seven years and exclusive use and possession of the Cadillac she drove. Lance was awarded exclusive use and possession of the home at 5483 Beatline Road. They were ordered to share the proceeds of a time share condominium in Kissimmee, Florida, and personal state and federal income tax refunds from 1988 or 1989 that resulted from joint filings. Lance was also ordered to pay Beatrice's attorney fees of $3,000.

LAW
Beatrice has appealed. Lance has cross-appealed alleging excessiveness of award.

PERIODIC ALIMONY
The chancellor in the divorce judgment ordered Lance to pay Beatrice $600 monthly periodic alimony for "a period of seven years or until such time as she remarries, dies, or until further order of the court." Beatrice contends that she is entitled to a greater sum and that it should have no set termination date. We agree.
In setting alimony amounts, this Court has consistently stated that the chancellor should consider the elements set forth in Brabham v. Brabham, 226 Miss. 165, 84 So.2d 147, 153 (1955), in which the Court stated:
The lower court should award reasonable sums of alimony ... in light of conditions as they now prevail, including (1) the health of the husband and his earning capacity; (2) the health of the wife and her earning capacity; (3) the entire sources of income of the parties; (4) the reasonable needs of the wife; ... (6) the necessary living expenses of the husband; (7) the estimated amount of income taxes the respective parties must pay on their incomes; (8) the fact that the wife has free use of the home furnishings *197 and automobile; and (9) such other facts and circumstances bearing on the subject that might be shown on the evidence.
In Gray v. Gray, 562 So.2d 79, 83 (Miss. 1990), we held that the "chancellor should consider the reasonable needs of the wife and the right of the husband to lead as normal a life as possible with a decent standard of living."
Under the facts of this case, there was no reason for the chancellor to set a time certain for the termination of alimony payments. There was nothing about the circumstances of this case or the situation of the parties which required a fixed termination date of the alimony payments by Lance to Beatrice, and the chancellor was manifestly in error in doing so. All periodic alimony is subject to change, depending upon the condition of the parties, in any event. To set a fixed termination date when there is no way to anticipate the needs of Beatrice seven years from the date of the decree, or Lance's ability to pay, was error.
We also find from the facts of this record that the amount of alimony awarded Beatrice was clearly less than she needs to sustain her, and considerably less than Lance is able to pay. We therefore reverse and render the chancellor's award of periodic alimony, setting it at One Thousand ($1,000) per month, until further order of the chancery court.

LUMP SUM ALIMONY
Beatrice also appeals the award of lump sum alimony, claiming it is too low.
In White v. White, 557 So.2d 480, 483 (Miss. 1989), we listed several factors to be considered by the chancellor in determining whether to award lump sum alimony and amount:
1) Substantial contribution to accumulation of total wealth of the payor either by quitting a job to become a housewife, or by assisting in the spouse's business. Tutor v. Tutor, 494 So.2d 362 (Miss. 1986); Schilling v. Schilling, 452 So.2d 834 (Miss. 1984);
2) A long marriage. Jenkins v. Jenkins, 278 So.2d 446 (Miss. 1973); Tutor and Schilling, supra;

3) Where the recipient spouse has no separate income or the separate estate is meager by comparison. Jenkins, Tutor and Schilling, supra;

4) Without the lump sum award the receiving spouse would lack any financial security. Abshire v. Abshire, 459 So.2d 802, 804 (Miss. 1984).
A closer analysis of these cases, however, reveal that the single most important factor undoubtedly is the disparity of the separate estates.
Also, Cheatham v. Cheatham, 537 So.2d 435, 438 (Miss. 1988); Retzer v. Retzer, 578 So.2d 580, 592 (Miss. 1990).
Beatrice worked in the beginning for Coastal Chiropractic cleaning the clinic, doing laundry and producing all advertising for the clinic. Beatrice was responsible for bulletins, mailouts, television advertising and some radio advertising. After they married, she continued working for Lance upon his request in the same capacities. She also decorated the clinic, entertained business guests and provided transportation for these guests to the airport. Beatrice attended seminars on how to improve the chiropractic business. Beatrice was at the office daily until the separation and received no salary. She recruited Lance's father to assist in the financial management of the clinic in 1988. Beatrice also performed the usual tasks of a housewife. The only income Beatrice reported during the marriage was $2,184.90 in 1986 and $967 in 1988. From this record it is clear that Lance's financial success was due in significant part to the efforts of her work.
Beatrice had almost no financial security, relying on Lance. Beatrice was forty-four years old at the time of divorce with scoliosis that limited her work ability. Her range of occupations and potential salary was little, if any, above minimum wage.
Lance's personal income grew from $59,000 in 1984 to $108,860 in 1988, excluding expenses paid for by the business, such as the Mercedes and its maintenance, and his medical insurance. Lance's May 17, 1989, *198 personal financial statement gives his net worth as $227,800. This is before the separation.
Because Lance's net worth increased during their marriage and Beatrice's services contributed to it, she was entitled to a fair and equitable award of lump sum alimony, as the chancellor found. He erred, however, in the amount awarded.
In view of the increase we have made in periodic alimony, we decline to set any fixed increase in lump sum alimony, instead remanding this matter to the chancellor to make an increase in some amount which he finds fair and equitable, based upon the circumstances of this case and the financial situation of the parties. Branton v. Branton, 559 So.2d 1038 (Miss. 1990); White; Schilling; Tutor.
In view of our finding, there is no need to address the cross-appeal.
AFFIRMED ON CROSS-APPEAL. REVERSED AND REMANDED IN PART; REVERSED AND RENDERED IN PART ON DIRECT APPEAL.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.
DAN M. LEE, P.J., dissents with separate written opinion joined by BANKS, J.
DAN M. LEE, Presiding Justice, dissenting:
As we approach the issues presented in this appeal, we must be mindful that our appellate perspective of this case is governed by a well-defined scope of review.
"The Chancery Court's decision on alimony will not be disturbed on appeal unless it be found against the overwhelming weight of the evidence or manifestly in error." McNally v. McNally, 516 So.2d 499, 501 (Miss. 1987), citing Harrell v. Harrell, 231 So.2d 793 (Miss. 1970). "In the case of a claimed inadequacy or outright denial of alimony, we will interfere only where the decision is seen oppressive, unjust or grossly inadequate so as to evidence an abuse of discretion." McNally, 516 So.2d at 501, citing Martin v. Martin, 271 So.2d 391 (Miss. 1972). "The amount of an alimony award is a matter to a great extent within the discretion of the chancery court because of its peculiar opportunity to sense the equities of the situation before it." Holleman v. Holleman, 527 So.2d 90, 94 (Miss. 1988), citing Wood v. Wood, 495 So.2d 503 (Miss. 1986).
Notwithstanding the substantial deference which this Court's scope of review affords the local chancellor on questions of support obligation, I also recognize that this Court has not hesitated in the past to find abuses of discretion and intervene to increase the amount of alimony that the lower court allowed. See Tutor v. Tutor, 494 So.2d 362, 365 (Miss. 1986) (lump sum alimony increased from $50,000.00 to $150,000.00); Rainer v. Rainer, 393 So.2d 475, 478 (Miss. 1981) (monthly periodic alimony increased from $150.00 to $250.00). To like effect, there have been instances wherein this Court has reduced the amount allowed by the lower court or reversed the allowance of alimony outright. See Brendel v. Brendel, 566 So.2d 1269, 1273 (Miss. 1990) (alimony reduced from $750.00 per month to $600.00); Carpenter v. Carpenter, 519 So.2d 891, 895 (Miss. 1988) (Court reversed allowance of $300.00 monthly alimony); Lowry v. Lowry, 229 Miss. 376, 384, 90 So.2d 852, 856 (1956) (alimony reduced from $200.00 per month to $150.00).
However, in the overwhelming majority of instances wherein this Court has found some error in the allowance of alimony, or the amount  either excessive or inadequate, the case is remanded to the lower court with the proper instruction to consider or reconsider the Brabham factors. See, e.g., Robinson v. Irwin, 546 So.2d 683 (Miss. 1989); Cheatham v. Cheatham, 537 So.2d 435 (Miss. 1988); Kergosien v. Kergosien, 471 So.2d 1206 (Miss. 1985); Rudder v. Rudder, 467 So.2d 675 (Miss. 1985); Reeves v. Reeves, 410 So.2d 1300 (Miss. 1982); Wires v. Wires, 297 So.2d 900 (Miss. 1974); Clark v. Clark, 293 So.2d 447 (Miss. 1974); Martin v. Martin, 271 So.2d 391 (Miss. 1972); Brabham v. Brabham, 226 Miss. 165, 84 So.2d 147 (1955). This practice of remanding to the lower court for *199 consideration of the Brabham factors recognizes the chancellor's advantageous perspective of "sensing the equites between the parties" as well as the chancellor's obvious familiarity with the facts of the case.
In Brabham v. Brabham, 226 Miss. 165, 176, 84 So.2d 147, 153 (1955), this Court required the chancellor to consider several factors in awarding original sums of alimony or child support. These factors are as follows:
(1) The health of the husband and his earning capacity;
(2) The health of the wife and her earning capacity;
(3) The entire sources of income of both parties;
(4) The reasonable needs of the wife;
(5) The reasonable needs of any children;
(6) The necessary living expenses of the husband;
(7) The estimated amount of income taxes the respective parties must pay on their income;
(8) The fact that the wife might have free use of the home, furnishings, and automobile; and,
(9) Such other facts and circumstances bearing on the subject that might be shown by the evidence.
The result which the majority reaches today takes a new twist. On the one hand, the majority finds sufficient detail in the record to justify an increase in the allowance of periodic alimony from $600.00 monthly for seven years to $1000.00 monthly with no time restriction, except by order of the court. On the other hand, however, the majority opts to remand to the lower court with an instruction to increase the award of $50,000.00 lump sum alimony to an amount, "fair and equitable, based upon the circumstances of this case and the financial situation of the parties."
While the majority instructs the chancellor to be "fair and equitable based upon the circumstances," it also restricts the lower court's ability to fully consider all factors relative to the amount of support obligation having concluded for the chancellor that $1000.00 is the proper amount for periodic alimony. Simply put, the chancellor is instructed to be "fair and equitable," but at the same time the majority takes away the chancellor's best instrument of accomplishing fairness and equity by totally removing from his consideration the issue of periodic alimony. Thus, the chancellor's hands are tied.
Because I find the majority's peculiar result in direct derogation of settled principles governing the equities of support obligation as outlined in Brabham, supra, and the broad discretion which is typically needed by the lower court in resolving such issues, I respectfully dissent.
BANKS, J., joins this opinion.