IRVING, J.,
 

 for the Court:
 

 ¶ 1. Trenton Russell Sheffield Jr. and Mary Ann West Sheffield were married on May 11, 1984, in Lowndes County, Mississippi. The Sheffields separated in 2005. Mary Ann filed for divorce on April 11, 2007, alleging desertion and habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Mary Ann later amended her complaint to include adultery as an additional ground for divorce. The Lowndes County Chancery Court granted the couple a divorce on the grounds of desertion and adultery and awarded Mary Ann $4,500 per month in permanent periodic alimony. Feeling aggrieved, Russell appeals and asserts that the chancery court erred in determining the amount of alimony because it failed to properly consider the amount of debt assigned to him in the division of the marital estate.
 

 ¶ 2. Finding no reversible error, we affirm.
 

 FACTS
 

 ¶ 3. When Russell and Mary Ann married, Mary Ann worked as the office manager at her family’s construction business. Shortly after their marriage, Russell started his own construction business, Sheffield Construction, Inc. (SCI). Mary Ann worked as the office manager for SCI until 1994, when the Sheffields agreed that Mary Ann should stay home to rear their two children, Maggie and Meredith. Mary Ann testified that she has a high school diploma and attended two years of college. She does not hold a college degree, has limited computer skills, and has no specialized vocational training. Mary Ann’s work experience has been limited to performing bookkeeping and secretarial duties for her family’s and Russell’s businesses. She is currently employed part time and receives $800 per month in gross wages. Mary Ann’s only other source of income is her
 
 *1144
 
 one-fourth interest in Legacy, Inc. (Legacy). Legacy consists of real estate gifted to Mary Ann and her three siblings by their parents. Mary Ann plays no active role in Legacy’s management, but she does receive annual distributions. The court-appointed valuation expert valued Mary Ann’s interest in Legacy at $202,000.
 

 ¶4. Russell is a self-employed contractor with interests in several closely held companies. At the time of the parties’ marriage, Russell started his principal business, SCI. Over the course of the marriage, Russell started two additional businesses, RDI, Inc. (RDI) and Batting Unlimited, Inc. (Batting). RDI’s primary operations consist of renting portable toilets. Batting began as a batting-cage business, but it now specializes in rental property. Russell is the sole shareholder and officer of both SCI and RDI. He maintains a fifty-percent interest in Batting. Additionally, Russell holds a one-third interest in MCS Properties (MCS). MCS owns 260 acres of land valued at $260,000. According to Russell’s Rule 8.05 financial statement, Russell earns a monthly gross income of $5,416.67. Russell testified that his monthly living expenses totaled $1,583.00; however, Russell further testified that many of his personal expenses are paid by SCI and RDI.
 

 ¶ 5. Applying the Ferguson
 
 [1]
 
 factors, the chancellor divided Russell and Mary Ann’s marital property and awarded Mary Ann $273,965.58 in marital assets and Russell $250,571.59 in marital assets. The chancellor classified Mary Ann’s interest in Legacy as her separate property, and Russell’s interests in SCI, RDI, Batting, and MCS were awarded to him by way of equitable distribution.
 

 ¶ 6. Following the division of the marital assets, the chancellor addressed Mary Ann’s request for alimony. Applying the
 
 Armstrong
 

 [2]
 

 factors, the chancellor found the following:
 

 [Mary Ann’s] lifestyle is based on a need for a home and enough money to service the mortgage, as well as to maintain a style and manner of living to which she is accustomed to. On the other hand, [Russell] will be able to continue to derive income from his various companies so as to enable him to maintain a very comfortable lifestyle. In fact, SCI has produced profits since June 30, 2007. It goes without saying that [Russell] has substantially more earning power than [Mary Ann], [Mary Ann] will have difficulty finding employment that will enable her to maintain the same lifestyle she enjoyed during the marriage. The [chancery court] recognizes that [Mary Ann’s] separate estate, as well as the other property she received via equitable division herein, can partially offset her expenses. However, an invasion of these funds to pay for current living expenses will further reduce her principal and result in even less income. [Mary Ann] will need regular monthly income to sustain her in the future.
 

 ¶ 7. In determining its alimony award, the chancery court also considered the following: that Mary Ann and Russell’s two children were emancipated, that Mary Ann was granted a divorce on the grounds of desertion and adultery, and that Mary Ann and Russell had been married for twenty-five years. Based on its
 
 Armstrong
 
 analysis, the chancery court awarded Mary Ann $4,500 per month in permanent periodic alimony.
 

 ¶ 8. Additional facts, as necessary, will be related during our analysis and discussion of the issue.
 

 
 *1145
 
 ANALYSIS AND DISCUSSION OF THE ISSUE
 

 ¶ 9. The decision to award alimony as well as the amount of alimony awarded are left to the discretion of the chancellor.
 
 Vaughn v. Vaughn,
 
 798 So.2d 481, 436 (¶ 20) (Miss.2001). An alimony award will not be disturbed on appeal absent a finding of manifest error or abuse of discretion.
 
 Voda v. Voda,
 
 731 So.2d 1152, 1154 (¶ 7) (Miss.1999). The chancellor’s discretion notwithstanding, alimony “should be reasonable in amount, commensurate with the wife’s accustomed standard of living, minus her own resources, and considering the ability of the husband to pay.”
 
 Holley v. Holley,
 
 969 So.2d 842, 844 (¶ 11) (Miss.2007) (quoting
 
 Creekmore v. Creekmore,
 
 651 So.2d 513, 517 (Miss.1995)). The Mississippi Supreme Court has held that alimony awards in excess a spouse’s ability to pay are
 
 “per se
 
 unreasonable.”
 
 Yelverton v. Yelverton,
 
 961 So.2d 19, 28 (1118) (Miss.2007) (citing
 
 Brooks v. Brooks,
 
 652 So.2d 1113, 1122 (Miss.1995)).
 

 ¶ 10. Russell does not take issue with the chancellor’s division of marital assets; however, he argues that the chancellor failed to consider the fact that Mary Ann received largely unencumbered assets while Russell received assets burdened with considerable debt. Russell argues that given the amount required to service the debt associated with the marital assets assigned to him, the alimony award exceeds his ability to pay.
 

 ¶ 11. “The equitable distribution of property and awards of alimony comprise the entire field of financial settlement between parties incident to a divorce.”
 
 Brooks,
 
 652 So.2d at 1120-21. “Where one expands, the other must recede.”
 
 Id.
 
 at 1121 (quoting
 
 Ferguson,
 
 639 So.2d at 929). “Therefore, the equitable division of property, awards of alimony, whether lump-sum or periodic, and all other obligations imposed upon a payor spouse should all be considered together by the chancellor.”
 
 Id.
 
 (quoting
 
 Ferguson,
 
 639 So.2d at 929). Consequently, when reviewing the reasonableness of an alimony award, an appellate court will “consider the totality of the chancellor’s awards upon the divorced parties, including the benefit to the payee spouse and the concomitant burden placed upon the payor spouse.”
 
 Id,
 

 ¶ 12. Although the chancellor awarded Russell his interests in SCI, RDI, and Batting, Russell argues that the chancellor failed to appropriately consider the outstanding debts associated with those interests when determining the alimony award. The chancellor appointed a valuation expert who prepared valuation reports for SCI, RDI, and Batting as of June 30, 2007,
 
 [3]
 
 using the net-asset-value method. However, because the liabilities of both SCI and RDI exceeded their assets, the expert valued those companies at zero. Despite the expert’s valuation of zero, both SCI and RDI actually had negative equity of $568,284 and $253,647, respectively. The valuation expert valued Russell’s one-half interest in Batting at $35,000.
 

 ¶ 13. While the record reflects that both SCI and RDI have significant outstanding liabilities, SCI’s 2007 federal income tax return reflected taxable income of $616,119. Furthermore, Russell’s accountant testified that SCI completed two construction projects in 2008, for which it received profits totaling $185,000. Finally, the valuation expert testified that despite assigning a value of zero to SCI and RDI under the net-asset-value method, SCI and
 
 *1146
 
 RDI were viable companies capable of making profits.
 

 ¶ 14. Despite being awarded nearly all of the income-producing assets, Russell complains that the award of alimony is unreasonable given the negative equity positions of SCI and RDI. This Court has previously considered the appropriateness of alimony awards in light of property division that leaves one party responsible for a majority of the marital debt.
 
 Dunaway v. Dunaway,
 
 749 So.2d 1112 (Miss.Ct.App.1999). In
 
 Dunaway,
 
 the chancellor awarded the husband ownership of the couple’s dairy farm.
 
 Id.
 
 at 1116 (¶ 9). However, the chancellor also assigned the husband substantially all of the marital debt.
 
 Id.
 
 The husband argued that the chancellor’s alimony award of $1,800 per month constituted an abuse of discretion in light of the fact that his former wife was also awarded $681,000 in unencumbered assets and a money judgment of $115,552.91.
 
 Id.
 
 at 1118 (¶ 15). This Court stated that there “seem[ed] to be considerable force behind the argument that the total award was excessive .... ” and reversed the alimony payments that had accrued.
 
 Id.
 
 at 1119 (¶ 17).
 

 ¶ 15. At first blush, it may seem that
 
 Dunaway
 
 supports Russell’s argument that the alimony award is unreasonable given his responsibility for the debts associated with his businesses. However,
 
 Dunaway
 
 is easily distinguishable from this case. The husband in
 
 Dunaway
 
 claimed that he had no means of servicing the debt assigned to him given the “limited profitability” of his dairy farm business.
 
 Id.
 
 at 1116 (¶ 8). In fact, he had filed for bankruptcy protection at the time of the divorce proceeding.
 
 Id.
 
 at 1120 (¶ 26). Despite his struggling business and limited income stream, this Court still upheld the chancellor’s decision to assign nearly all of the marital debt to the husband.
 
 Id.
 
 at 1116-17 (¶¶ 9-10).
 

 ¶ 16. Clearly, the financial condition of the husband in
 
 Dunaway
 
 differs from that of Russell. SCI’s 2007 federal income tax return listed income of $616,119. Additionally, SCI completed two construction projects in 2008 for which it realized profits totaling $185,000. Finally, the valuation expert testified that SCI was a viable business capable of making profits in the future. While it is uncontested that SCI is highly leveraged, with liabilities exceeding assets by over $500,000, it is clear that SCI is capable of producing profits to service the debt. Furthermore, as this Court noted in
 
 Dunaway,
 
 if Russell “concludes that he cannot deploy the assets set apart to him in the divorce to produce sufficient income to service the debt secured by those assets, he has the option to liquidate those assets, retire the debt, and utilize the net proceeds in a more profitable endeavor.”
 
 Id.
 
 at 1118 (¶ 13).
 

 ¶ 17. This case is further distinguishable from
 
 Dunaway,
 
 given that the wife in
 
 Dunaway
 
 had died while the husband’s appeal was pending.
 
 Id.
 
 at 1119 (¶ 17). As such, the husband’s periodic alimony obligation had ended.
 
 Id.
 
 This Court acknowledged that there was “considerable force” behind the husband’s argument that the
 
 total
 
 amount awarded to the wife was excessive, but it based its decision to reverse the alimony award largely on the fact that the wife was deceased.
 
 Id.
 
 Mary Ann is fifty-four years old and in good health. However, given her lack of a college degree and long absence from the workforce, she has far less earning potential than Russell. While her separate property and the property she received via equitable division may offset her expenses, they are insufficient to maintain the standard of living she enjoyed during the marriage and do not eliminate the need for alimony.
 

 ¶ 18. Finally, we are not convinced that the chancellor’s alimony award exceeds
 
 *1147
 
 Russell’s ability to pay. SCI, Russell’s primary business, was profitable in both 2007 and 2008. Russell also testified that many of his personal and living expenses are paid out of SCI. He does not have a mortgage or rental payments on his home or a car payment. Additionally, the record reflects that Russell made a large number of discretionary expenditures, including a hunting trip to Argentina, vacations to Honduras and Cancún, and the purchase of a Harley Davidson motorcycle. Finally, Russell has previously demonstrated his ability to provide spousal support in an amount nearly identical to the alimony awarded. Russell testified that from 2005, when the parties separated, to 2007, when the temporary support order was entered, he voluntarily paid the following for Mary Ann’s benefit: (1) $2,000 mortgage on the marital home, (2) between $300 and $400 for health insurance, and (3) $2,300 in cash for personal expenses-a total expenditure of $4,600 per month.
 

 ¶ 19. The chancellor properly considered the
 
 Armstrong
 
 factors, which included an inquiry into the obligations and assets of each party. As such, we do not find that the chancery court committed manifest error or abused its discretion in its determination of the alimony award. This issue lacks merit.
 

 ¶ 20. THE JUDGMENT OF THE LOWNDES COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 .
 
 Ferguson v. Ferguson,
 
 639 So.2d 921, 928 (Miss.1994).
 

 [2]
 

 .
 
 Armstrong v. Armstrong,
 
 618 So.2d 1278, 1280 (Miss.1993).
 

 [3]
 

 . The chancery court entered a temporary support order on June 13, 2007; therefore, the parties agreed to use June 30, 2007, for purposes of valuing the marital estate.