# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00752-COA

**ANDREW PHANG**                                                                      **APPELLANT**

**v.**

**VERGENIA PHANG**                                                                     **APPELLEE**

DATE OF JUDGMENT:              06/11/2021
TRIAL JUDGE:                  HON. JENNIFER T. SCHLOEGEL
COURT FROM WHICH APPEALED:    HARRISON COUNTY CHANCERY COURT,
                              SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:       WILLIAM BRIAN ATCHISON
ATTORNEY FOR APPELLEE:        SUZANNE BAKER STEELE
NATURE OF THE CASE:           CIVIL - DOMESTIC RELATIONS
DISPOSITION:                  AFFIRMED IN PART; REVERSED AND
                              REMANDED IN PART; REVERSED AND
                              RENDERED IN PART - 08/16/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., WESTBROOKS, AND McCARTY, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     Andrew Phang appeals certain aspects of the Harrison County Chancery Court's judgment of divorce as it pertains to alimony and other financial matters, including whether certain behavior by the parties contributed to the demise of their relationship. The chancellor's judgment is affirmed in part, reversed and remanded in part, and reversed and rendered in part.

## FACTS AND PROCEDURAL HISTORY

¶2.     Andrew and Vergenia were married in July 1986 and separated in February 2020. Two children were born of the marriage. Both children were over the age of majority at the

time of the parties' separation. Although Vergenia worked outside the home during most of the marriage, the discrepancy between their incomes was great, and Andrew provided the vast majority of the family's income. Vergenia has been unemployed since she voluntarily quit her job in November 2018.[1] On April 23, 2020, Andrew filed a complaint for divorce in the Harrison County Chancery Court on grounds of habitual cruel and inhuman treatment or irreconcilable differences. Vergenia filed a counterclaim alleging habitual cruel and inhuman treatment, adultery, or irreconcilable differences as grounds for divorce. The parties filed a consent to adjudicate, which gave the chancellor permission to grant the Phangs a divorce based on irreconcilable differences and also to adjudicate the financial issues. A trial on the merits was held April 6-7, 2021, and a judgment of divorce on the ground of irreconcilable differences was entered on June 11, 2021.

¶3. The Phangs did not have a substantial amount of cash or many valuable possessions except the marital home, Andrew's military retirement, his Ingalls 401(k) retirement account, his pension, and other investment accounts that amounted to a considerable sum. In making an equitable distribution of the parties' assets, the chancellor specifically applied the factors set forth in *Hemsley v. Hemsley*, 639 So. 2d 909 (Miss. 1994), to characterize the Phangs' assets as marital or non-marital. Because Andrew served in the United States Air Force prior to meeting Vergenia, part of his military retirement was considered his separate property. The chancellor also awarded Andrew a coin collection that he brought to the marriage. It is

---

[1] Vergenia's decision to quit her job was not discussed with Andrew. Vergenia has high blood pressure and diabetes; ostensibly, she quit work for health reasons, but it is undisputed that no physician formally told her she could not work.

undisputed that Vergenia had no separate property. Next, the chancellor divided the parties'

marital assets as provided in *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994). The

division of the marital estate gave assets with a total equity value of $606,074.55 (which

included the marital home) to Vergenia and assets with a total equity value of $606,034.17

to Andrew.[2] Neither party disputed the manner in which the chancellor categorized their

property or divided their assets.

¶4.     After an analysis of the parties' income and needs pursuant to the factors set forth in

*Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993), the chancellor ordered

Andrew to pay $2,700 in permanent monthly alimony, which would end upon Vergenia's

death or remarriage. Andrew was required to provide a life insurance policy to secure the

alimony payments. Andrew also was required to give Vergenia internet access to his military

retirement account via "myPay" (which would allow her to view, but not make changes to,

the account) and to provide her with copies of his annual tax returns. The chancellor ordered

Andrew to take over the payments on their daughter's student loan debt. The chancellor

further ordered the parties responsible for their own attorney's fees.

¶5.     Andrew now appeals, raising six issues: (1) whether the chancellor erred by awarding

$2,700 in permanent monthly alimony to Vergenia; (2) whether the chancellor erred by

failing to specify that Andrew's obligation to pay alimony ends upon his death; (3) whether

the chancellor erred by requiring Andrew to maintain a life insurance policy in the amount

---

[2] We note that the chancellor's judgment lists Andrew's part of the marital estate as $606,034.17 on page 16 and as $607,034.17 on page 24. Based on the values assigned to the chart on pages 15-16, we find that $606,034.17 is the correct figure.

of $91,000, naming Vergenia as the beneficiary; (4) whether the chancellor erred by ordering Andrew to provide Vergenia proof of his annual income; (5) whether the chancellor erred by determining that Vergenia's gambling was not a contributing factor to the divorce; and (6) whether the chancellor erred by determining that Andrew's behavior had a negative impact on the parties' relationship. We absorb the latter two issues and address them among the first four.

## STANDARD OF REVIEW

¶6.     "The scope of review in domestic cases is limited by the substantial evidence/manifest error rule. This Court will not disturb a chancellor's findings unless they were manifestly wrong or clearly erroneous, or the chancellor applied an erroneous legal standard." *Lee v. Lee*, 154 So. 3d 904, 906 (¶5) (Miss. Ct. App. 2014) (citations omitted).

## DISCUSSION

I.     **Whether the chancellor erred by awarding $2,700 in permanent monthly alimony to Vergenia.**

¶7.     Based on the chancellor's detailed discussion and application of the *Armstrong* factors, the chancellor awarded Vergenia permanent periodic alimony of $2,700 per month. Andrew argues the chancellor failed to take into account all sources of income available to Vergenia, including: her failure to begin drawing Social Security benefits, the fact that she could have returned to the work force, and the income-producing assets awarded to her through the distribution of marital property. Andrew believes the award of alimony is excessive because had the chancellor considered these potential sources of income, it would have properly determined that it was unnecessary to award Vergenia permanent alimony

4

when the equitable distribution of assets met her needs and expenses. Andrew further maintains that the chancellor failed to properly take into account the alleged fault that should have been attributed to Vergenia, as well as the fact that any alleged fault on his part was wrongly imputed to him. Andrew also briefly mentioned that the alimony award will be excessive when Andrew retires and that it will leave him with an income deficit.

¶8. As the *Ferguson* court stated, the goals of equitable distribution are a fair division of marital property based on the facts of each case and termination of the legal relationship in a manner in which each party may realize self-sufficiency. *Ferguson*, 639 So. 2d at 929. But self-sufficiency is not always possible. In such cases, the decision to award alimony and, if so, in what amount, is left to the chancellor's discretion. *Voda v. Voda*, 731 So. 2d 1152, 1154 (¶7) (Miss. 1999). Of course, though, "[t]he chancellor should consider the reasonable needs of the wife and the right of the husband to lead as normal a life as possible with a decent standard of living." *Gray v. Gray*, 562 So. 2d 79, 83 (Miss. 1990).

### A. Available Sources of Income

¶9. Andrew maintains that in making her decision regarding alimony, the chancellor failed to take into consideration all sources of income that were available to Vergenia. He specifically argues that Vergenia's ability to apply for Social Security benefits should have been taken into account. In *Alford v. Alford*, 298 So. 3d 983, 994 (¶40) (Miss. 2020), the Mississippi Supreme Court definitively held that "[a] chancellor cannot make a prospective determination concerning the effect of a spouse's derivative Social Security benefits at the time of the initial alimony award." We know of no precedent under which a party to a

5

divorce can be required to apply for Social Security benefits. While a chancellor certainly may take Social Security benefits into account when making an alimony determination, because Vergenia was not yet receiving Social Security benefits, any receipt of them would not properly be considered prior to a subsequent petition for modification. *Id.* This allegation of error has no merit.

¶10. Andrew also alleges that the chancellor did not consider Vergenia's earning potential if she were to return to the workforce. The chancellor's order clearly discussed the "parties' health and earning capacity" in the section pertaining to alimony. The chancellor noted that Vergenia was sixty-two years old at the time of the divorce, and had no formal education.[3] The chancellor also stated that over the course of the couple's thirty-four-year marriage, Vergenia's work history (which was interrupted for several years while she raised the couple's children) was comprised of low-paying, hourly jobs and that Andrew's earning potential was much greater than Vergenia's. Although Vergenia admitted that no physician had diagnosed her as being unable to work, at trial she testified about her health and the fact that she had been diagnosed with hypertension and that marital stress had exacerbated her health issues. Although not referenced by the chancellor, medical records were put into evidence at trial, and Vergenia was questioned about their contents. Further, the chancellor's judgment did indicate that Vergenia had been prescribed medication for diabetes, thyroid issues, and cholesterol. Vergenia also presented a letter from her physician stating that her blood-pressure fluctuations could cause falls and that exertion (including prolonged standing)

---

[3] Vergenia is originally from the Philippines. We have no information regarding her educational background other than that she received no "formal" education.

could cause dizziness. She further testified that she was afraid of injuring her head or dying from such a fall or dying from hypertension like both her parents. The chancellor was entitled to rely on all the evidence and testimony pertaining to this issue in making her decision, and we presume that the chancellor did so. *Voda*, 731 So. 2d at 1155 (¶11).

¶11. "Even if the chancellor has failed to delineate all the factors on the record, where all the facts are available to us, we are not required to remand the case to the trial court." *Id.* We find the facts available to the chancellor (and to us) on this issue are similar to those in *Sheffield v. Sheffield*, 55 So. 3d 1142 (Miss. Ct. App. 2011). Although Mrs. Sheffield's earning potential was not at issue on appeal, in upholding the award of permanent alimony, this Court noted:

> Mary Ann is fifty-four years old and in good health. However, given her lack of a college degree and long absence from the workforce, she has far less earning potential than Russell. While her separate property and the property she received via equitable division may offset her expenses, they are insufficient to maintain the standard of living she enjoyed during the marriage and do not eliminate the need for alimony.

*Id.* at 1146 (¶17). The Phangs were married nearly ten years longer than the Sheffields. *See id.* at 1143 (¶1). Mrs. Sheffield had two years of college, while Vergenia had no formal education. *See id.* at 1143 (¶3). Mrs. Sheffield was younger than Vergenia and in better health. *See id.* at 11456 (¶17). Based on the foregoing, there was no abuse of discretion by the chancellor.

¶12. A review of the parties' income and expenses prior to the award of alimony shows Andrew was left with a monthly surplus, and Vergenia was left with a sizeable monthly deficit. But Andrew contends that the income-producing potential of the assets awarded to

7

Vergenia through the equitable distribution of the marital estate were not properly taken into account by the chancellor. He is correct that anticipated income from the distribution of marital property should be taken into account when determining an award of alimony. *Ferguson*, 639 So. 2d at 929. Although not set forth in the section of the chancellor's judgment addressing the *Armstrong* factors, it cannot be said that the chancellor failed to take Vergenia's income-producing assets into account. At the end of the alimony analysis, the chancellor's judgment states:

> While this award appears to put both parties at an income deficit,[4] they are both receiving significant assets from which they may derive supplemental income. Vergenia has the benefit of the home[5], portions of the Primerica IRA, and portions of Andrew's Ingalls 401(k) and pension. . . . Although the Court has endeavored to limit penalties from IRA withdrawals, one or both of the parties may have to utilize these funds as the Court cannot invent another source of income.

This assignment of error has no merit.

### B. Fault

¶13. We find that a discussion of issues enumerated by Andrew as "V - Whether the chancellor erred by determining that Vergenia's gambling was not a contributing factor to the divorce" and "VI - Whether the chancellor erred by determining that Andrew's behavior had a negative impact on the parties' relationship" is appropriately undertaken in this section.

¶14. Andrew states in his opening brief that "Vergenia's gambling was a significant

---

[4] Subsequent to the alimony award, Andrew would have a monthly deficit of $913.87 with Vergenia having a deficit of $530.90. As discussed later in Subsection C, the deficits are lower in amount than is set forth in the chancellor's judgment or the parties' briefs.

[5] *See Williams v. Williams*, 129 So. 3d 233, 243 (¶38) (Miss. Ct. App. 2013) (Although a house is an asset, it does not produce income if one lives in it.).

8

contributing factor to the divorce and was a dissipation of marital assets[]" and goes on to point out that she lost $22,000 as a result of her gambling habit. However, Andrew makes no actual argument pertaining to the dissipation of assets by Vergenia.[6] Instead, he maintains that Vergenia's gambling and her quitting her job without his permission constitute "fault" or "bad faith" and were not properly contemplated by the chancellor in making her alimony decision.[7] Andrew also alleges the chancellor's finding that Andrew's actions had a negative impact on the marriage was erroneous. Andrew supplied a scant argument about why he believes the chancellor erred regarding these issues, and he supplied no proper legal authority pertaining to these issues. As elsewhere in his briefing, Andrew makes no attempt to discuss why or how the cases he cites weigh in his favor (and rarely points to a specific page of the opinion cited). *See Jefferson v. State*, 138 So. 3d 263, 265 (¶9) (Miss. Ct. App. 2014) (citation omitted) (holding that "[a]n appellant cannot give cursory treatment to an issue and [expect] this Court to uncover a basis for the claims, either in the record or in the law.").

¶15. Fault is indeed required to be considered by the chancellor when determining alimony. *Armstrong*, 618 So. 2d at 1280. But we must bear in mind that a chancellor "is presumed to have taken into consideration all of the relevant factors affecting the question of alimony[,]

---

[6] In *Lowrey v. Lowrey*, 25 So. 3d 274 (Miss. 2009), the Mississippi Supreme Court discussed dissipation, but Andrew does not cite it for this purpose. The chancellor made specific findings of fact regarding dissipation as required by *Armstrong*, and because Andrew presented no argument on this point, we do not address the issue. *See* M.R.A.P. 28(a)(7).

[7] We note that in allocating the Phangs' assets, the chancellor credited Vergenia with the amount she lost at the casino ($58,702.56) and gave Andrew other assets in the amount of one-half ($29,351) of Vergenia's losses to offset the half he "lost" before trial.

9

and his decision will not be disturbed, unless [it is] manifestly wrong." *Pickering v. Pickering*, 51 So. 2d 740, 741 (Miss. 1951). In this instance, we are not called upon to make presumptions. After hearing testimony and viewing the evidence related to each parties' arguments, the chancellor made on-the-record findings related to each *Armstong* factor—including the allegations of fault by each party. The chancellor discussed Vergenia's gambling and noted that it was funded from Vergenia's own earnings.[8] The chancellor also discussed the "negative cycle" caused when Andrew forbid Vergenia from spending time with friends and her daughter and required her to ask permission before using credit cards. The chancellor held that "[u]ltimately, both parties bear some responsibility for failing to communicate better about their issues, but Andrew's pattern of attempted control seems to have had a more direct negative impact on the quality of their relationship."

¶16. A review of the chancellor's findings about the remaining *Armstrong* factors gives no indication that she imputed more weight to "fault" than any other *Armstrong* factor in making a decision to award alimony. The chancellor's finding as to any alleged fault by either party cannot be said to have been clearly erroneous.

### C. Amount of Alimony

¶17. Andrew argues that "[t]he amount of alimony awarded by the chancellor will be excessive once [he] retires within two years[.]" In response, Vergenia properly asserts that when awarding alimony, the chancellor is to focus on the current situation of the parties.

---

[8] The parties agree that over the years, their arrangement had been for Andrew to pay the bulk of the family's living expenses from his earnings, and Vergenia could basically spend her earnings as she liked.

*Cleveland v. Cleveland*, 600 So. 2d 193, 196 (Miss. 1992). Andrew counters with one sentence: "The amount of alimony awarded is not equitable because the amount exceeds Andrew's net spendable income, is excessive[,] and this error should be reversed." A cite to *McEachern v. McEachern*, 605 So. 2d 809 (Miss. 1992), is given, but no application of the case to the instant situation is provided. As stated previously "[a]n appellant cannot give cursory treatment to an issue and [expect] this Court to uncover a basis for the claims, either in the record or in the law." *Jefferson*, 138 So. 3d at 265 (¶9). Given the unique facts of this situation, we choose to review this allegation of error.

¶18. "The amount of an alimony award is largely within the discretion of the chancellor[.]" *Magee v. Magee*, 754 So. 2d 1275, 1279 (¶7) (Miss. Ct. App. 1999). Unless the chancellor's decision constitutes manifest error and an abuse of her discretion, we will not reverse. *Armstrong*, 618 So. 2d at 1280 (citing *McEachern*, 605 So. 2d at 814 (Miss. 1992); *Cherry v. Cherry*, 593 So. 2d 13, 19 (Miss. 1991)). But the spouse requesting alimony must show "a deficit with respect to having sufficient resources and assets to meet . . . her needs and living expenses[.]" *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013). And Mississippi Supreme Court precedent makes clear that when determining what amount of alimony is appropriate, "[a] payor must be left with sufficient income to meet basic needs." *Wildman v. Wildman*, 301 So. 3d 787, 797 (¶18) (Miss. Ct. App. 2020).

¶19. Andrew's adjusted gross income was $7,997.13 per month, while Vergenia received no monthly income (aside from the $500 in spousal support). However, after the chancellor's judgment, she would receive $898.01 per month from Andrew's military

11

retirement. Taking into account each party's monthly expenses (totaling $10,845.53), there is unquestionably insufficient income to cover all the expenses, and certainly neither Vergenia nor Andrew will be able to maintain the lifestyle to which they were accustomed during their marriage. When the alimony award is factored in, the chancellor's judgment shows that Andrew is left with a monthly deficit of $1,169.87, and Vergenia has a $780.02 deficit. However, according to the evidence presented at trial, these amounts are slightly inflated. Vergenia lists the mortgage payment as $1,352.13, the chancellor stated that the mortgage payment is $1,310.42, and the actual amount of the payment is $1,061.30. Taking these figures into account, Vergenia's expenses are $249.12 less than those stated in the chancellor's judgment. Likewise, Andrew's Rule 8.05 financial statement, UCCR 8.05, indicates that he was paying $36 for gas, $70 for water/sewer, and $150 for electricity—all for the house—meaning his monthly expenses were $256 less than the calculation presented at trial. Factoring these errors in, Andrew was left with a monthly deficit of $913.87, and Vergenia had a $530.90 deficit.[9]

¶20. We find that the chancellor clearly performed the required detailed financial analysis of the parties' incomes and expenses, health and earning capacities, needs, assets, and tax consequences. The chancellor realized and took into account the deficits imposed on the parties by her award:

> While this award appears to put both parties at an income deficit, they are both receiving significant assets from which they may derive supplemental income.

---

[9] When the chancellor's mathematical calculations are incorrect, this Court can "simply disregard[] the computation error and substitut[e] the correct sum for purposes of our analysis." *Dunaway v. Dunaway*, 749 So. 2d 1112, 1116 (¶10) (Miss. Ct. App. 1999).

12

. . . Although the Court has endeavored to limit penalties from IRA withdrawals, one or both of the parties may have to utilize these funds as the Court cannot invent another source of income.

Although not helpful to the parties in the short term, the chancellor noted that Vergenia would be better "able to meet her basic needs" once Andrew retires and she begins receiving her portion of his Ingalls 401(k) retirement account. It should also be mentioned that the financial information submitted by the parties at trial indicates a net worth of $1,154,878.81. As previously stated, the chancellor's focus was the current income and needs of the parties. *Cleveland*, 600 So. 2d at 196. We recognize that "[o]rdering a spouse to make payments beyond his means has been held to be reversible error[,]" *Franklin v. Franklin*, 864 So. 2d 970, 980 (¶46) (Miss. Ct. App. 2003) (citing *Tilley v. Tilley*, 610 So. 2d 348, 354 (Miss. 1992)), but given the Phangs' circumstances, the chancellor saw no better solution and did her best to provide for both parties.[10] We cannot say the chancellor abused her discretion regarding alimony (either the award or the amount) payable to Vergenia.

## II. Whether the chancellor erred by failing to specify that Andrew's obligation to pay alimony ends upon his death.

¶21. The chancellor's judgment specifies that Andrew's obligation to pay alimony ends upon Vergenia's death or remarriage. However, the judgment fails to take into account what would happen if Andrew predeceases Vergenia. Andrew argues that this constitutes error. Vergenia appears to concede the argument, citing *Armstrong*, 618 So. 2d at 1281, for the

---

[10] We take note of the fact that cases like *Yelverton v. Yelverton*, 961 So. 2d 19 (Miss. 2007), required reversal of alimony awards where the husband was left with a deficit. However, Yelverton is distinguishable. Rhonda Yelverton was a nurse and she was capable of returning to work full-time. *Id.* at 28 (¶¶17-18).

proposition that "[p]eriodic alimony terminates automatically upon the death of the obligor or the death or remarriage of the obligee." *See also Holley v. Holley*, 969 So. 2d 842, 844 (¶11) (Miss. 2007) (holding that periodic alimony is not subject to time limitations, but is subject to change or end if the recipient remarries or either party dies). We agree that this constitutes error. This portion of the chancellor's judgment is reversed, and the case is remanded so that the judgment can be changed to correct the error.

III. **Whether the chancellor erred by requiring Andrew to maintain a life insurance policy in the amount of $91,000 naming Vergenia as the beneficiary.**

¶22. Andrew also argues that the chancellor's requirement that he maintain a $91,000 life insurance policy payable to Vergenia upon his death is excessive. The chancellor's order quotes *Layton v. Layton*, 181 So. 3d 275, 288 (¶42) (Miss. Ct. App. 2015), stating that "[a] spouse may be required to maintain life insurance in an amount sufficient to satisfy financial obligations, including alimony that would survive his death[.]" Thus, the chancellor's intent was to provide for Vergenia in case Andrew dies owing alimony. *See Coggins v. Coggins*, 132 So. 3d 636, 644 (¶37) (Miss. Ct. App. 2014) ("Recognizing the possibility that an alimony payor may fall behind in periodic-alimony payments and then die leaving those vested payments unsatisfied, this court has acknowledged the chancellor's authority to require the alimony payor to maintain a life-insurance policy to protect the recipient spouse against such a contingency."). Andrew does not argue against having a policy in place. His argument is that because periodic alimony does not vest until it is due, upon his death the only alimony that could be owed to Vergenia would be any unpaid periodic payments that

14

have already vested (i.e., that are late). *See Ali v. Ali*, 232 So. 3d 770, 777 (¶23) (Miss. Ct. App. 2017).

¶23.  A review of cases does not provide a "rule of thumb" for situations like this. For example, in *Johnson v. Pogue*, 716 So. 2d 1123, 1134 (¶41) (Miss. Ct. App. 1998), this Court held that a $75,000 insurance policy was excessive to ensure monthly alimony payments of $500. In *Coggins*, we found that requiring the former wife to be listed as a beneficiary to $175,000 in life insurance proceeds was excessive where the alimony payments were only $504 per month. *Coggins*, 132 So. 3d at 645 (¶38). The potential discrepancy between the amount of the life insurance policy and the potential amount Andrew owed is much less in this instance, but—as Vergenia points out—Andrew would still have to fall behind in alimony by thirty-three months in order to necessitate a $91,000 insurance policy. The chancellor provided no rationale for this award other than "as security for the permanent periodic alimony awarded" to Vergenia. Further, there is no evidence that Andrew has ever fallen behind in the payment of alimony imposed pursuant to the temporary order or the chancellor's judgment. Under these circumstances, we find that this ruling constitutes error. This portion of the chancellor's judgment is reversed, and the case is remanded for the chancellor to determine whether requiring Andrew to designate Vergenia as a beneficiary is necessary to protect the alimony obligations that may be vested at the time of Andrew's death. In the event the chancellor deems the life insurance policy to be necessary, it should be set at an amount that commiserates with Andrew's potential obligations.

### IV. Whether the chancellor erred by ordering Andrew to provide Vergenia proof of his income every year.

¶24. The chancellor required Andrew to give Vergenia internet access to his military retirement account via "myPay" (which will allow her to view, but not make changes. to the account) and to provide her with copies of his tax returns yearly. Andrew maintains it is unnecessary for him to provide his annual tax returns because Vergenia will have knowledge of any changes to his military retirement through "myPay," and it is inequitable for him to provide Vergenia with his tax returns when she is not required to reciprocate. Vergenia's only argument in support of her position is that the tax returns allow her to see Andrew's income "under penalty of perjury," while the "myPay" system does not. There is no indication in the record that Andrew has been anything less than forthcoming with any financial information.

¶25. We agree with Andrew that any assets he might accrue after the divorce (or date of demarcation) that might appear on his future tax returns would be separate assets. *Collins v. Collins*, 112 So. 3d 428, 431-32 (¶9) (Miss. 2013). Should Vergenia ever move to modify the alimony award, she will be obligated to meet all requirements under Mississippi law. Additionally, she can request Andrew's tax returns at that time, if needed. Based on the record before us, the chancellor abused her discretion in requiring Andrew to give Vergenia copies of his tax returns. The chancellor's judgment on this issue is reversed and rendered in Andrew's favor.

## CONCLUSION

¶26. We find that Andrew has not demonstrated an abuse of discretion related to the chancellor's award of alimony. Both the grant and the amount of alimony awarded to

16

Vergenia were supported by substantial evidence, and this portion of the judgment is affirmed. We find that the failure of the chancellor to rule that Andrew's alimony obligations end with his death constitutes an abuse of discretion. This portion of the chancellor's judgment is reversed, and the case is remanded so that the order can be changed to reflect the foregoing. We find that the chancellor abused her discretion in requiring Andrew to maintain a life insurance policy in the amount of $91,000. This portion of the chancellor's judgment is reversed, and the case is remanded so the chancellor can reevaluate the need for life insurance and, if needed, set a value for a life insurance policy that commiserates with any alimony payments that may have vested at the time of Andrew's death. Finally, the chancellor abused her discretion in requiring Andrew to give Vergenia copies of his annual tax returns. The chancellor's judgment on this issue is reversed and rendered in favor of Andrew.

¶27.     **AFFIRMED IN PART; REVERSED AND REMANDED IN PART; REVERSED AND RENDERED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**

17